BDB:JJB:mel

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEREMY PINSON,** | : | **No. 1:CV-17-0584** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **FEDERAL BUREAU OF PRISONS;** | : | |
| **UNITED STATES OF AMERICA;** | : | |
| **M. MAGYAR, ASST. H.S.A.;** | : | |
| **ELISABETE SANTOS; AND ALL** | : | |
| **OTHER MEMBERS OF THE BOP** | : | |
| **TCCT AND TEC,** | : | |
| **Defendants** | : | **Filed Electronically** |

## STATEMENT OF MATERIAL FACTS

Defendants Federal Bureau of Prisons, United States of America,

M. Magyar, and E. Stahl (formerly E. Santos), by and through their

counsel and pursuant to Local Rule 56.1, hereby submit the following

statement of material undisputed facts in support of their motion for

summary judgment.  Plaintiff Jeremy Pinson is advised that, pursuant

to Local Rule 56.1, all facts set forth in this statement will be deemed

admitted unless controverted by Pinson with references to the record supporting Pinson's position.

## A. Pinson's Housing at USP Allenwood and Disciplinary History

1.  Pinson was assigned to USP Allenwood from March 10, 2016 through July 18, 2016.  See Ex. 1 (Declaration of L. M. Rodarmel) ¶ 3; Attach. B (Inmate History, Adm-Rel) at 1-3; Ex. 2 (Declaration of A. Handel) ¶ 2; Ex. 3 (Declaration of E. Stahl) ¶ 5.

2.  Upon arrival to USP Allenwood, Pinson was housed in the Special Housing Unit (SHU).  Ex. 1 ¶ 4.

3.  Pinson was not forced or threatened to enter general population. Id.

4.  Pinson agreed to enter the general population in order to participate in the Challenge Program.[1] Id.

5.  Pinson was interviewed and determined to be appropriate for the Challenge Program.  Id.

---

[1] The Challenge Program is a residential program designed by the Bureau of Prisons (BOP) to meet the treatment needs of the high security inmates who have substance abuse and mental health disorders.  The program encourages a healthy and crime free approach to life.  The program also allows inmates to work together to create a community that supports pro-social attitudes and behaviors.

6.   On April 14, 2016, Pinson was released from the SHU to the general population to participate in the Challenge Program.  Id.

7.   On May 9, 2016, Pinson was placed back into the SHU pending the outcome of an investigation.  Ex. 1 ¶ 5.

8.   The deciding official who placed Pinson in SHU would have been a lieutenant from correctional services or the Special Investigative Service when there is an investigation pending.   Id.

9.   The investigation was completed and determined Pinson should be transferred to another facility.  Id.

10.   Pinson remained in the SHU until transferred to USP Terre Haute on July 18, 2016.  Id.

11.   Pinson's extensive discipline history is set forth in a thirty-page report and includes, but is not limited to, incident reports for threatening bodily harm, interfering with taking of the count, destruction of property, assault, possession of a weapon, self-mutilation, disruptive conduct-High, insolence, misusing medication, setting a fire, taking a hostage, refusing orders, among others.  Id.; Attach. C.

B.   <u>**Dr. Stahl, the BOP's Transgender Clinical Care Team and Surgery Eligibility Requirements by the World Professional Association for Transgender Health**</u>

12.   Dr. Stahl is employed by the Federal Bureau of Prisons as a physician and Clinical Director assigned to the Allenwood Federal Correctional Complex (FCC Allenwood).  Ex. 3 (Stahl Decl.) ¶ 1.

13.   As Clinical Director, Dr. Stahl serves as the primary physician for a full scope and range of medical services provided to approximately 3,000 inmates housed at FCC Allenwood.  <u>Id.</u> ¶ 2.

14.   As Clinical Director, Dr. Stahl serves as the clinical supervisor for approximately forty health care staff including physicians, physician assistants, nurses, and other clinicians.  <u>Id.</u> ¶ 3.

15.   In addition to administrative duties as Clinical Director, Dr. Stahl follows a panel of patients who Dr. Stahl personally sees for their Chronic Care Clinic evaluations every six to twelve months or more, as clinically indicated.  <u>Id.</u> ¶ 4.

16.   In November 2014, the Bureau of Prisons (BOP) established a Transgender Clinical Care Consultant Team (TCCT) to provide guidance/consultation services to BOP clinical staff treating inmates with transgender concerns.  <u>Id.</u>

4

17. TCCT members had been educated on the Endocrine Society Clinical Practice Guideline, the only published Trans Health Guideline at the time. Id. ¶ 11.

18. Members of the TCCT also attended multiple Trans Health medical conferences to gain the knowledge necessary to develop a BOP Guideline. Id.

19. The BOP released an Interim Resource Guide in November of 2014, to guide and educate all BOP staff in the unique needs of all transgender inmates, to include general guidance on psychological and medical assessments, housing considerations, commissary needs, etc. Id. ¶ 12; Attach. B (BOP Transgender Resource Guide).

20. Dr. Stahl currently serves as the Chair of the TCCT. Id. ¶ 4.

21. As Chair of the TCCT, Dr. Stahl is often asked to help in the management of transgender inmates both locally and at other BOP institutions. Id.

22. During the four month period of time Pinson was confined to USP Allenwood from March 10, 2016, through July 18, 2016, the BOP

did not have any clinical guidelines in place for treating transgender inmates with gender dysphoria.  Id. ¶¶ 5, 11.

23.  It was not until December 2016, months after Pinson was transferred from USP Allenwood, that the BOP Guideline on this subject was released.[2]  Id. ¶ 11.

24.  Community standards considered for treatment were provided to Pinson and included those set forth by the World Professional Association for Transgender Health (WPATH).  Id. ¶ 13.

25.  The WPATH standards "are an information resource which may provide guidance on medical and mental health treatment, which may include education, counseling, medical evaluations, hormone treatments, 'real-life' experience, and, in some but not all cases, sexual reassignment surgery."  Id., Attach. B at 3.

26.  WPATH's eligibility criteria for the sexual reassignment surgery includes a well documented gender dysphoria[3], capacity to consent

---

[2] The guideline, titled "Medical Management of Transgender Inmates" and clearly dated "December 2016" was recently submitted to the Court by Pinson with a motion asking that the Court take judicial notice of it. See Doc. 18.  The motion was granted on August 3, 2017.  Doc. 24.

[3] Gender dysphoria is defined in the BOP's Transgender Resource Guide as "A strong and persistent cross-gender identification.  It is

to treatment, age of majority, twelve months of feminizing

hormone therapy, and twelve months of continuous living in the

gender role that is congruent with one's gender.  <u>Id.</u> ¶ 13.

27. The WPATH recommends two letters of support from treatment

providers to support the surgery-- typically one letter from a

psychologist/clinical social worker and one letter from the medical

provider.  <u>Id.</u> ¶¶ 13, 16.

28. The WPATH recommends that if there are psychological and/or

medical problems, these must be "reasonably well controlled" prior

to consideration for surgical transitioning.  <u>Id.</u>


C. **<u>Pinson's Relevant Psychological and Medical Treatment at
   USP Allenwood</u>**

29. Upon arriving at USP Allenwood on March 10, 2016, Pinson

received an intake screening by the Psychology department.  <u>See</u>

Ex. 2 (Handel Decl.) ¶ 5; Attach. A (BOP Psychology Services

Record) at 111-113.

---

manifested by a stated desire to be the opposite sex and persistent
discomfort with his or her biologically assigned sex."  <u>See</u> Ex. 3, Attach.
A at 1.

30.   The psychologist noted that Pinson had an extensive history of mental illness dating back to the age of 10.  Id. ¶ 5; Attach. A at 112.

31.   The psychologist noted during periods of anger, Pinson had been identified as someone who hurts others (people and animals) with objects including knives.  Id.

32.   Upon arriving at USP Allenwood on March 10, 2016, Pinson also received a medical intake screening by a registered nurse.  See Ex. 3 (Stahl Decl.) ¶ 8; Attach. A (BOP Medical Record) at 214-220.

33.   It was not until June 2015, that Pinson was diagnosed with gender dysphoria.  Ex. 2 ¶ 5; Attach. A at 112.

34.   Pinson's psychological treatment included therapy sessions focused on depressive issues related to gender dysphoria as well as improving DBT (dialectical behavior therapy[4]) skills.  Id.

---

[4] DBT is behavior therapy used to identify obstacles to changing emotions; reduce vulnerability to emotional mind; increase positive emotional events; increase mindfulness to current emotions; apply distress tolerance techniques.  Ex. 2 ¶ 5.

35.   The psychologist noted that, throughout Pinson's incarceration with the BOP, Pinson regularly received individual counseling but continued to engage in self-harm (cutting wrists, swallowing pills, cutting testicles).  Ex. 2. ¶ 6; Attach. A at 112.

36.   Pinson denied suicidal ideation and any thoughts of self-harm or significant distressing emotions.  Id.

37.   The psychologist's "current concerns" were noted as Pinson engaging in self harm due to poor distress tolerance and perceived lack of control.  Id.

38.   There had been two occasions prior to arrival at USP Allenwood where Pinson engaged in genitalia mutilation for being distressed over having a penis rather than a vagina.  Id.

39.   It was recommended that Pinson could be placed into general population but was being placed in the SHU until cleared by custody.  Id. ¶ 6; Attach. A at 113.

40.   It was recommended Pinson have a cellmate as a protective factor, especially while housed in the SHU.  Id.

41.   Pinson was determined to be a care level 3 mental health inmate. Id. ¶ 7.

9

42.  The psychologist decided it was appropriate to see Pinson weekly in a private session.  <u>Id</u>

43.  The psychologist saw Pinson more frequently than once a week. <u>Id.</u>

44.  Pinson would often claim suicidal thoughts in order to be seen by the psychologist but then would focus on things such as personal property or hygiene items.  <u>Id.</u>

45.  The psychologist concluded in these instances there were no genuine suicidal thoughts or intent to self-harm but rather attempts to manipulate staff in order to obtain things Pinson wanted.  <u>Id.</u>

46.  A true suicidal inmate would not have concerns about hygiene items or personal property items.  <u>Id.</u>

47.  On March 11, 2016, Pinson requested to speak with Psychology Services and their discussion included a belief that Pinson did better having a cellmate (which was provided upon placement in SHU).  <u>Id.</u> ¶ 8; Attach. A at 110.

48.  Pinson spoke positively and the thought process was noted as logical, coherent, and goal oriented.  <u>Id.</u>

49.   Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.  Id.

50.   On March 15, 2016, Pinson discussed safety concerns for entering general population and a desire to remain in protective custody in the Special Housing Unit (SHU).   Id. ¶ 9; Attach. A at 109.

51.   Pinson wanted a transfer to another facility and personal property, mainly female undergarments.   Id.

52.   The psychologist discussed coping skills and noted that Pinson had a more positive outlook since first arriving at USP Allenwood. Id.

53.   Pinson's legal work was reported as being another positive outlet to stay focused in the SHU.  Id., Attach. A at 109.

54.   Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.  Id. ¶ 9; Attach. A at 109.

55.   On March 17, 2016, Dr. Stahl saw Pinson to assist in co-managing treatment for the gender dysphoria diagnosis.  Ex. 3 (Stahl Decl.) ¶ 9.

56.   Dr. Stahl noted Pinson was trans-female on feminizing hormone therapy.  Id. ¶ 9; Attach. A at 190-93.

57.   Dr. Stahl noted Pinson's subjective description of history including gravitating toward girl activities and Pinson's unfamiliarity with the concept of "trans" as a teen and associating it with being homosexual.  Id. ¶ 9; Attach. A at 190.

58.   Pinson also stated having been in prison since the age of 17, which is also when the cutting began, including genitalia.  Id.

59.   It was noted another medical provider started Pinson on an Estradiol (female hormone) patch on December 27, 2015, to enhance feminine characteristics.  Id.

60.   On March 18, 2016, Pinson reported no mental health concerns to psychology and SHU staff reported no observed mental health problems or issues with the inmate.  Ex. 2 ¶ 10; Attach. A at 108.

61.   On March 22, 2016, Pinson expressed feelings of relief and satisfaction with the current cellmate to psychology.  Id.; Attach. A at 107.

62.   Pinson indicated how having a positive cellmate helps avoid self-injurious behavior.  Id.

63.   Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.  Id.

64. On March 22, 2016, a psychiatrist performed an evaluation of Pinson. Ex. 3 ¶ 10; Attach. A at 185-89.

65. The psychiatrist documented Pinson had a history of anxiety and had previously received Ativan, which requires special approval. Id.

66. The psychiatrist prescribed Perphenazine for anti-social personality disorder and Trihexyphenidyl used for the side effects of the Perphenazine (tremors, etc.).   Id.

67. On April 5, 2016, Pinson reported mood swings since switching to new estrogen medication and being unable to deal with the mood swings to psychology.  Ex. 2 ¶ 12; Attach. A at 107.

68. Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.   Id.

69. On April 11, 2016, the psychologist noted that Pinson met the criteria to be considered a care level 3 mental health inmate requiring enhanced outpatient mental health care and would be seen weekly. Id. ¶ 13; Attach. A at 103.

70. The psychologist noted that Pinson threatens to sue staff and engage in self harming behaviors when frustrated.  Id.

71.   The psychologist noted that Pinson has a long history of inappropriate, intense anger or difficulty controlling anger and is prescribed anti-psychotic medication.   <u>Id.</u>

72.   In reviewing these notes, the psychologist comments that Pinson is an inmate who would attempt to manipulate staff by threatening suicide or self-harm in order to achieve secondary gain such as "appropriate undergarments".   <u>Id.</u> ¶ 14.

73.   The psychologist also comments that efforts were made to not only keep Pinson safe from harm by others and harm by self but also trying to treat the inmate's medical and mental condition.   <u>Id.</u>

74.   The psychologist exerted great effort in balancing the dual goals of keeping Pinson safe while also providing treatment and being sensitive to the unique needs of an inmate with Gender Dysphoria- Transgender.   <u>Id.</u>

75.   On April 18, 2016, Pinson reported a PREA (Prison Rape Elimination Act) incident that occurred on the housing unit between Pinson's cellmate and another inmate.   <u>Id.</u> ¶ 15; Attach. A at 96-97.

76. Pinson was offered access to a victim advocate from the local community but declined the information and any services.  Id.

77. On April 21, 2016, it was noted Pinson had recently been released to the compound from the administration detention ("ADX") section of the SHU.  Id. ¶ 16; Attach. A at 95.

78. It was noted that Pinson was adjusting to living in an open space versus being locked down, going to the yard to exercise, cooking food and socializing in the unit.  Id.

79. Pinson reported a change in the BOP over the years and was surprised with the overall acceptance of Pinson by other inmates and staff on the compound.  Id.

80. Coping skills were reviewed and it was noted that Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.  Id.

81. On April 25, 2016, Pinson was continuing to adjust to the compound and was looking for a job.  Id. ¶ 17; Attach. A at 94.

82. The psychologist discussed medications with Pinson and the importance of taking the medications as prescribed.  Id.

83.  Pinson was noted as being happy with a mentor assignment and was talking with him every day.  Id.

84.  Coping skills were discussed and it was noted that Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.  Id.

85.  On May 2, 2016, Pinson reported adjustment to the compound was "going great".  Id. ¶ 18; Attach. A at 93.

86.  Pinson reported having a job in the kitchen washing pots and pans, was continuing to do legal work to stay busy, and focused. Id.

87.  Pinson's report was viewed as very positive given the lengthy period of time Pinson was in lockdown status prior to arriving at USP Allenwood.  Id. ¶ 19.

88.  It appeared Pinson was transitioning well to general population. Id.

89.  Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.   Id.

90.     On May 9, 2016, it was reported that Pinson had a good week,

        enjoyed working in the kitchen, and liked the general population

        at USP Allenwood).  Id. ¶ 21; Attach. A at 91.

91.     Pinson and the psychologist discussed available programs offered

        at USP Terre Haute and at USP Allenwood.  Id.

92.     Pinson denied suicidal/homicidal or self-injurious behavior

        ideation, intention or plan.  Id.

93.     Later that day, a Special Investigative Agent (SIA) notified the

        Chief Psychologist that Pinson had reported allegations related to

        PREA.  Id. ¶ 21; Attach. A at 90.

94.     Pinson told the Chief Psychologist that another inmate threatened

        to "pimp" out Pinson and Pinson's cellmate.  Id.

95.     Pinson was offered access to a victim advocate from the local

        community but declined the information and any services from the

        victim advocate.  Id.

96.     A lieutenant determined it was appropriate for Pinson to be

        housed in the SHU temporarily while an investigation was

        performed to assess Pinson's safety in open population.  Id. ¶ 21.

97.   On May 13, 2016, a psychologist performed a Suicide Risk Assessment of Pinson at the request of the Chief Psychologist.  Id. ¶ 22; Attach. A at 87-89.

98.   Pinson's history was recounted and current problems were listed as "extreme inward emotional pain and frustration." Id. ¶ 22; Attach. A at 87.

99.   Pinson, expressing frustration and irritability with being placed back in the SHU, "hated being 'placed in a box'" and experienced urges to cut.  Id.

100.  Pinson was reminded that the placement was a result of the report of PREA and safety concerns which needed to be investigated.  Id.

101.  The psychologist noted risk and protective factors assessed.  Id. ¶ 22; Attach. A at 88.

102.  The psychologist noted the current suicide risk for Pinson at the time as being "moderate" and "present."  Id.

103.  Pinson reported the lack of desire to live and an urge to cut.  Id.

104.  A formal suicide watch was initiated for Pinson via the use of inmate suicide watch companions.  Id.

105.  Pinson was authorized the following items as a condition of the suicide watch:  mattress, safety smock, and a safety blanket.  <u>Id.</u>

106.  While on suicide watch, a psychologist would evaluate Pinson on a daily basis.  <u>Id.</u> ¶ 22; Attach. A at 89.

107.  Inmates on suicide watch are not permitted to shave and do not receive shaving razors.  <u>Id.</u> ¶ 22.

108.  On May 14, 2016, a psychologist had an encounter with Pinson but Pinson refused to come to the door and was uncooperative.  <u>Id.</u> ¶ 23; Attach. A at 85.

109.  It was noted that Pinson was being watched by an inmate companion and that Pinson should stay on suicide watch.  <u>Id.</u>

110.  On May 15, 2016, a psychologist reviewed Pinson and noted Pinson's "affect was normal and mood was euthymic." <u>Id.</u> ¶ 24; Attach. A at 83.

111.  Pinson denied suicidal and/or homicidal ideation intent.  <u>Id.</u>

112.  There were no clinical indications that Pinson was in danger of self-harm at the time.  <u>Id.</u>

113.  Pinson reported working closely with a primary psychologist and
was upset following placement in SHU due to the fact that
emotions oscillate as a result of hormone therapy.  <u>Id.</u>

114.  According to Pinson, Pinson did not want to talk to the
psychologist the day before because Pinson was cold and wanted
to stay under the blanket.  <u>Id.</u>

115.  Pinson further explained that, at the time of the initial
assessment, Pinson was very upset about being in SHU.  <u>Id.</u>

116.  The psychologist concluded that, given Pinson's presentation,
willingness to engage in the assessment process, level of
cooperativeness and future orientation, and talking and joking
with the inmate companion, there was no reason to continue
suicide watch placement.  <u>Id.</u> ¶ 24; Attach. A at 84.

117.  It was determined Pinson was no longer considered a suicide risk
and should be removed from suicide watch.  <u>Id.</u>; Attach. A at 83-
84.

118.  The psychologist noted that Pinson's mental health status was
within normal limits, that Pinson had a safety plan in place and
would follow it if there were any thoughts of self-harm.  <u>Id.</u>

20

119.  On May 17, 2016, Pinson expressed annoyance for being placed in SHU for reporting the PREA incident.  Id. ¶ 25; Attach. A at 82.

120.  Pinson emphasized hating being in isolation again and being on an "emotional roller coaster".  Id.

121.  Pinson discussed a possible increase in medication.  Id.

122.  The psychologist reviewed impulsivity and skills used to refrain from urges to cut.  Id.

123.  Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan.  Id.

124.  On May 18, 2016, Pinson reported urges of cutting the night before and surrendered a razor, which was then turned over to correctional services to be disposed of.  Id. ¶ 26; Attach. A at 80.

125.  Pinson reported being stressed and having mood swings.  Id.

126.  The psychologist screened Pinson for a variety of empirically validated factors commonly associated with risk for self-harm and suicide.  Id.

127.  It was noted that Pinson expressed thoughts of cutting the night before but the thoughts had not returned.  Id.

128.  Prior records indicate Pinson's behavior was driven by attempts to control the conditions of confinement.  Id.

129.  Pinson acknowledged this to be true in some instances but at times has used self harm as a means of releasing frustration.  Id.

130.  Pinson was reinforced for alerting staff before acting on the impulses.  Id.

131.  Pinson displayed future orientation during the interview by asking for missing items from property and talking about the following week's session.  Id.; Attach. A at 80-81.

132.  Pinson's focus and concern for property items suggested to the psychologist that Pinson was not suicidal but rather was using the threat of self-harm to manipulate psychology services to obtain what was wanted.  Id. ¶ 27.

133.  Pinson was considered to be a low risk of suicide so suicide watch was not warranted at the time.  Id.

134.  On May 19, 2016, the SHU lieutenant contacted psychology and indicated Pinson was potentially suicidal.  Id. ¶ 28; Attach. A at 73-74.

135. Upon evaluation, Pinson stated irritability and stress over the pending investigation.  Id.

136. Pinson was also irritated for being told by the Warden that Pinson was manipulating staff.  Id.

137. Pinson was feeling dramatic and pissed and said extreme measures would be taken, if necessary, if SIS took weeks to complete its investigation.  Id.; Attach. A at 74.

138. Pinson asked about Care 3 "incentive items" (hygiene items, snacks, puzzles, self-help books, cards, radio, batteries, etc.)  to replace missing ones.  Id. ¶¶ 28-29; Attach. A at 73.

139. Pinson denied any present suicidal thoughts and the need to go on suicide watch.  Id.

140. Pinson was low risk for suicide and suicide watch was not warranted.  Id.

141. The psychologist perceived the interaction with Pinson to be another attempt to manipulate staff—a test to see if the Warden really made the comment about manipulating staff and if psychology services was in agreement with the Warden's statement.  Id. ¶ 29.

142. The psychologist also believes Pinson was using this manipulation in order to see psychology more than once a week.  Id.

143. The psychologist believes Pinson's focus on the Care level 3 incentive items suggested Pinson was not truly suicidal or at risk for self-harm but rather was using the threat to obtain secondary gain including increased contacts with psychology and a return of Care Level 3 incentive items.  Id.

144. On May 24, 2016, Pinson told a psychologist of "preparing for war" and reported staff as being rude and dismissive.  Id. ¶ 30; Attach. A at 72.

145. Pinson requested an increase in medication and request that Ativan be prescribed.  Id.

146. Pinson discussed the Transgender Law Center working to identify transgender conforming prison housing.  Id.

147. Pinson's thought process was logical, coherent, and goal oriented.  Id.

148. Pinson denied suicidal/homicidal/self-injurious behavior ideation, intention or plan.  Id.

149. The psychologist believed this encounter to be another attempt at Pinson manipulating the conditions of confinement to obtain an increased dosage in a prescription and to obtain additional medication/Ativan.  Id. ¶ 31.

150. Pinson's discussion regarding the Transgender Law Center suggested Pinson was not a suicide risk or a risk of self-harm but rather another attempt to manipulate staff and the conditions of confinement.  Id.

151. The psychologist states that Pinson was closely monitored since arriving at USP Allenwood.  Id. ¶ 32.

152. At the time of the incident on May 25, 2016, there was no objective or clinical indication that Pinson was a risk for a suicide attempt or self-injury.  Id. ¶ 32.

153. Pinson's extensive medical record for just five months from March 1, 2016 through August 1, 2016, is in excess of 500 pages.  Ex. 3 (Stahl Decl.) ¶ 7; Attach. A (Excerpt of Medical Record).

154. While housed at USP Allenwood for approximately twenty weeks, Pinson was seen in person for clinical encounters by five different

medical providers on thirteen different occasions.  Ex. 3 ¶ 7; Attach. A at 121-196.

155.   There are also twenty-one administrative notes in Pinson's medical record from practitioners who addressed a variety of issues.  <u>Id.</u>

156.   In approximately twenty weeks, Dr. Stahl saw Pinson on at least three occasions and provided input to other clinicians who were seeing Pinson on a regular basis.  <u>Id.</u> ¶ 7; Attach. A at 75-77, 164-65, 190-93.

157.   Dr. Stahl was only involved in Pinson's medical care as a consultant in the co-management of Pinson's trans-health.  <u>Id.</u> ¶ 7.

158.   Pinson was being seen by assigned primary care team members for all other medical conditions/concerns.  <u>Id.</u> ¶ 7; Attach. A at 121-196.

## D.   <u>AHSA Magyar's Involvement</u>

159.   Defendant Magyar is an Assistant Health Services Administrator (AHSA) at USP Allenwood.  See Ex. 4 (Declaration of M. Magyar) ¶ 1.

160. Defendant Magyar's duties as the AHSA do not involve providing medical or dental care to inmates.  Id. ¶ 2; Attach. A (Position Description).

161. AHSA Magyar serves as an advisor to the administration regarding overall administrative management and operations of health services.  Id.

162. AHSA Magyar supervises staff assigned to the medical department in the performance of their non-clinical duties.  Id.

163. AHSA Magyar recalls that Pinson started a fire in a SHU cell, which resulted in a unit wide emergency.  Id. ¶ 3; see also Ex. 3, Attach. A at 45.

164. When AHSA Magyar arrived, Pinson was unresponsive so the AHSA initiated emergency care, which was limited to rescue breathing only.  Id.

165. AHSA Magyar was not otherwise involved in the health care provided to Pinson.  Id.

166. AHSA Magyar was not involved in any decisions related to the health care plan for Pinson.  Id.

167. The AHSA's duties included responding to inmate grievances submitted in the form of administrative remedies.  Id.

168. AHSA Magyar responds to such grievances utilizing the inmate's medical record and input from the clinicians when needed.  Id.

169. On June 5, 2016, Pinson submitted an informal resolution form to his unit team, which states, "I want to know if the BOP offers sex reassignment surgery to its inmates, yes or no." Id., Attach. B (Informal Resolution Form) at 1.

170. The grievance was referred to AHSA Magyar for response.  Id. at 2.

171. On June 30, 2016, AHSA Magyar responded as follows:

According to the [WPATH], criteria for Gender Confirming Surgery includes Persistent well-documented gender dysphoria, Capacity to consent to treatment, Age of Majority, Twelve months of feminizing hormone therapy, and 12 months of continuous living in the gender role that is congruent with one's gender.  In addition, the WPATH recommends full clinical evaluations to be done by a licensed Psychiatrist/Psychologist, and Medical Doctor to document stable psychiatric and medical problems and "readiness" for extensive surgical interventions.  The BOP does not have any policy that prohibits sex affirming surgery, and provides individualized psychological/medical care to all individuals, including Feminizing/Masculinizing hormone regimens and supportive psychological treatment according to community standards.

28

According to your medical record you were just started on feminizing hormone therapy in January of 2016.  Your hormone levels are not at expected goals just yet; This does not meet WPATH's criteria for sex affirming surgery, which recommends a full 12 months of "feminizing hormone therapy".  Because of your severe anxiety, and several self mutilation episodes requiring hospitalization, and other security concerns (beyond the control of your treatment team) you were only living in general population for a very short time, and therefore not able to live "in the gender role that is congruent with one's gender."  Your psychiatric illness, despite nearly daily interactions with a licensed Psychologist, and evaluations by a Psychiatrist is not yet well controlled.  Given current standards of practice, you are not yet meeting criteria for sex affirming surgery.

You are receiving appropriate medical care in accordance with your clinical assessments.  If your condition has changed or worsened, please report to sick-call to have your concerns appropriately addressed by your Primary Care Provider.

Id.

## E.   **Pinson's Ineligibility for Sexual Reassignment Surgery**

172. Pinson was provided treatment pursuant to community standards.

     See Ex. 3 (Stahl Decl) ¶ 14.

173. Hormone therapy was initiated in December 2015, prior to Pinson

     arriving at USP Allenwood.   Id.

174. After arriving at USP Allenwood, a combined effort by health

     services and psychology services confirmed Pinson's diagnosis of

     gender dysphoria and hormone affirming therapy was continued

29

and adjusted as deemed necessary and with the patient's consent.
Id.

175.  Pinson's hormone levels were sub-therapeutic on arrival at USP
Allenwood and several adjustments were required to improve the
hormone levels.  Id. ¶ 15.

176.  Pinson did not meet the clinical criteria for gender affirming
surgery while confined to USP Allenwood because hormone levels
were still sub-therapeutic despite being on feminizing hormone
therapy for over one year.  Id.

177.  Pinson also did not meet the clinical criteria for surgery because
Pinson had not been able to socially transition into a female role
by continuously living in the gender role that is congruent with
the identified female gender (a required WPATH step for
vaginoplasty).  Id.

178.  There were also several concerns with respect to Pinson's physical
and mental health, which must be "reasonably well-controlled"
prior to consideration for surgery according to WPATH.  Id. ¶ 16.

179. As Pinson's medical provider at the time, Dr. Stahl would not have clinically supported gender affirming surgery for a variety of reasons.  <u>Id.</u>

180. Pinson's hormone levels were nowhere close to female physiologic levels.  <u>Id.</u>

181. Pinson was not fully compliant with all aspects of treatment.  <u>Id.</u>

182. Pinson did not always comply with wound care and other aspects of treatment.  <u>Id.</u>

183. Pinson was experiencing severe anxiety and oppositional behavior which was not "reasonably controlled" and would have precluded vaginoplasty surgery at that time.  <u>Id.</u>

184. Pinson was simply not a surgical candidate while confined to USP Allenwood.  <u>Id.</u> ¶ 17.

185. Pinson was provided extensive, supportive and compassionate care by health services and psychology services while at USP Allenwood.  <u>Id.</u>

186. Pinson did not meet the current WPATH criteria for gender affirming surgery at any time while confined to USP Allenwood.  <u>Id.</u>

**E.**   **The May 25, 2016 Incident**

187.   On May 25, 2016, at 12:30 p.m., a lieutenant making rounds in the SHU where Pinson was housed discovered Pinson cutting the left arm with a razor.   <u>See</u> Ex. 5 (Declaration of A. E. Klinefelter) ¶ 2; Attach. A (Form F83 Report of Incident) at 3; Attach. B (Memorandum).

188.   Pinson flushed the razor in the toilet and complied with staff orders by submitting to hand restraints.  <u>Id.</u>

189.   Pinson was removed from the cell, pat searched, metal detected, photographed, and escorted to Health Services for treatment.  <u>Id.</u>, Attach. A at 3; Attach. B.

190.   Pinson sustained multiple lacerations to the left arm, left leg, front and back of the head, scrotum, and tongue.  <u>Id.</u> ¶ 2; Attach. A at 3; Attach. B.

191.   Due to the nature of the injuries, Pinson was transported to a local hospital for further treatment.  <u>Id.</u>

192.   Pinson was interviewed by psychology staff and it was determined that a formal suicide watch was warranted.  <u>Id.</u>, Attach. B.

32

193.  Pinson was subsequently placed on suicide watch without further

incident.  Id.


**F.   Officer Frei's Involvement**

194.  Defendant Frei is employed by the BOP as a Correctional Officer

at USP Allenwood.  See Ex. 6 (Declaration of M. Frei) ¶ 1.

195.  Officer Frei's quarterly assignment from March 13 to June 11,

2016, was working the SHU "number three post."  Id. ¶ 3; Attach.

A (Excerpt of Correctional Service Roster for May 25, 2016) at 3.

196.  Officer Frei's days off were Sunday and Monday.  Id.

197.  Officer Frei's hours of duty were 13:45 to 21:45 (1:45 pm to 9:45

pm).  Id.

198.  In accordance with BOP Program Statement (P.S.) 5270.10,

Special Housing Units, disposable shaving razors were offered and

passed out to inmates three days a week.  Id. ¶ 4; Attach. B (P.S.

5270.10) at 9, 11.[5]

---

[5] Pinson makes reference to "Program Statement 5800.10" in the
complaint.  Am. Compl.  (Doc. 11) at 3.  The BOP does not have any
such program statement by that number.   Ex. 6 (Frei Decl.) ¶ 13.

33

199.  Inmates received razors on Monday, Wednesday, and Friday.  Id.
      ¶ 4.

200.  Officer Frei was off on Mondays but would provide razors to
      inmates who requested them on Wednesdays and Fridays.  Id.

201.  BOP policy does not require officers to maintain logs to keep track
      of razors.  Id. ¶ 5; Attach. B, generally.

202.  Officer Frei utilized an informal log to monitor and track who was
      provided razors in order to assure they were all collected/returned.
      Id.; Attach. C (Sample SHU Razor Log).

203.  This informal log was usually destroyed after thirty days.  Id. ¶ 5.

204.  A list of inmates who were on razor restrictions would be provided
      to the Number Three Officer by Psychology Services.  Id.

205.  Staff maintain a board in the SHU to track which inmates are
      housed there, razor restrictions, and other relevant information.
      Id.

206.  A magnetic marker was placed on the board of inmates who were
      housed in SHU if they were on razor restriction.  Id.

207. Officer Frei would pass razors out shortly after reporting for duty, give the inmates an hour to shave before collecting the razors, and mark the log that the razors had been collected/returned.  <u>Id.</u> ¶ 6.

208. While collecting the razors, Officer Frei would assure that the razor and blade was intact.  <u>Id.</u>

209. When the razors were collected, they were placed into a box that went into the "hot trash" which was emptied only by staff.  <u>Id.</u>

210. If an inmate refused to return a razor, Officer Frei would immediately contact the lieutenant.  <u>Id.</u> ¶ 7.

211. Pinson never refused to return a shaving razor to Officer Frei.  <u>Id.</u>

212. Each and every time razors were distributed by Officer Frei, they were returned and confirmed to be intact.  <u>Id.</u>

213. Officer Frei was not involved in any aspect of Pinson's medical or psychology care.  <u>Id.</u> ¶¶ 8, 11.

214. Officer Frei was unaware of any diagnosis of Pinson.  <u>Id.</u>

215. Officer Frei may on occasion have escorted Pinson to a medical or psychology appointment but was never present during the clinical encounter.  <u>Id.</u> ¶ 11.

216. Pinson was not on any type of razor restrictions from the time Pinson was placed in the SHU on May 9, 2016, until May 25, 2016.  Id.

217. Prior to the incident on May 25, 2016, there was no reason Pinson could not be provided a shaving razor like other inmates in the SHU.  Id. ¶¶ 8, 11.

218. Officer Frei was not present when the Pinson incident was discovered at 12:30 p.m. on May 25, 2016, as it was prior to him reporting for duty that day.  Id. ¶ 10.

219. Officer Frei did not come to work until 1:45 p.m. and did not pass out razors until after 2:00 p.m.   Id.

220. Since May 25, 2016, was a Wednesday and Officer Frei is off on Mondays, the most recent time Officer Frei would have passed out razors prior to 2:00 that day would have been five days earlier, on Friday, May 20, 2016.  Id. ¶¶ 3, 4, 10.

221. Pinson never told Officer Frei of any intentions to cut out the testicles. Id. ¶ 9.

222. Officer Frei denies ever making a statement to Pinson that he did

not care if Pinson cut the testicles out or that he goes home after

eight hours regardless.  Id. ¶ 12.

<div style="margin-left:40%">

Respectfully submitted,

BRUCE D. BRANDLER
United States Attorney


s/ J. Justin Blewitt, Jr.
J. JUSTIN BLEWITT, JR.
Assistant U.S. Attorney
PA 01710
Michele E. Lincalis
Supv. Paralegal Specialist
316 Federal Building
240 West Third Street
Williamsport, PA 17701
Phone:        (570) 348-2800
Facsimile:   (570) 348-2816
Justin.Blewitt@usdoj.gov

</div>

Dated: August 18, 2017

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEREMY PINSON,** | : | No. 1:CV-17-0584 |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **FEDERAL BUREAU OF PRISONS;** | : | |
| **UNITED STATES OF AMERICA;** | : | |
| **M. MAGYAR, ASST. H.S.A.;** | : | |
| **ELISABETE SANTOS; AND ALL** | : | |
| **OTHER MEMBERS OF THE BOP** | : | |
| **TCCT AND TEC,** | : | |
| **Defendants** | : | **Filed Electronically** |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.  That on August 18, 2017, she served a copy of the attached

## STATEMENT OF MATERIAL FACTS

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Williamsport, Pennsylvania.

Jeremy Pinson
16267-064
FMC Rochester
Federal Medical Center
P.O. Box 4000                     <u>s/ Melissa M. Rooney</u>
Rochester, MN  55903         Melissa M. Rooney, Contractor
                                            Senior Litigation Paralegal