# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEREMY V. PINSON,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:17-cv-00584** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **UNITED STATES, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff, Jeremy Pinson, an inmate currently confined at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester"), filed this current action pursuant to the Federal Tort Claims Act ("FTCA") and Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) on April 3, 2017. (Doc. No. 1.) Plaintiff subsequently filed an amended complaint on May 1, 2017. (Doc. No. 11.) Plaintiff asserts that she is a male to female transgender inmate and that Defendants wrongly denied her request for sex reassignment surgery and were negligent when they left a razor blade with her knowing that her gender dysphoria led her to cutting and self-mutilation.

Presently before this Court is Defendants' motion for summary judgment (Doc. No. 20), filed on July 18, 2017. Although Plaintiff has filed a second motion for discovery seeking a stay of the briefing deadlines on Defendants' motion for summary judgment (Doc. No. 42), Plaintiff's motion has been rendered moot given Defendants' subsequent supplemental discovery filings served on Plaintiff and

Plaintiff's subsequent filing of her brief in opposition to Defendants' motion for summary judgment (Doc. No. 47).

Defendants have filed a brief in support of their motion for summary judgment (Doc. No. 29), as well as their statement of material facts (Doc. No. 31). Plaintiff has filed her brief in opposition to Defendants' motion for summary judgment along with a counterstatement of material facts (Doc. No. 47.) Defendants filed a reply brief. (Doc. No. 52.) Accordingly, this matter is ripe for disposition.

## I.    BACKGROUND[1]

Pinson was incarcerated at USP-Allenwood from March 10, 2016 through July 18, 2016. (Doc. No. 31 ¶ 1.) Upon arrival, Pinson received an intake screening by the Psychology department and a medical intake screening by a

---

[1] Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. LR 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. Id. Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Unless otherwise noted, the factual background herein derives from Defendants' Rule 56.1 statement of material facts. (Doc. No. 31.) While Plaintiff filed a "counterstatement of material facts," attached to her brief in opposition, this statement does not meet the requirements of Local Rule 56.1 in that it does not include any record citations or references. (Doc. No. 47-1.) Accordingly, the Court deems the facts set forth by Defendants to be undisputed unless otherwise noted by the Court. See Local Rule 56.1; Fed. R. Civ. P. 56(e)(2); Bowman v. Mazur, Civ. No. 08-173J, 2010 WL 2606291, at *3 (W.D. Pa., Oct. 30, 2010) ("Plaintiff's responsive statement of material facts is insufficient to create a genuine issue of material fact because it failed to comply with Local Rule 56.1 … by failing to cite to specific portions of the record in support of his responsive concise statement of facts.")

registered nurse.  (Id. ¶¶ 29, 32.)  The psychology screening notes indicate that

Pinson had an extensive history of mental illness dating back to the age of 10.  (Id.

¶ 30.)  Pinson was housed in the Special Housing Unit ("SHU") on arrival.  (Id. ¶

2.)

　　　While at USP-Allenwood, Pinson received both psychological and medical

treatment.  (Id. at 7.)  In Pinson's psychology screening notes, the psychologist

noted that Pinson was diagnosed with gender dysphoria on June 2, 2015, prior to

her incarceration at USP-Allenwood.  (Id. ¶ 33.)  Pinson's psychological treatment

included therapy sessions focused on depressive issues related to gender dysphoria

as well as improving dialectical behavior therapy ("DBT")[2] skills.  (Id. ¶ 34.)  The

psychologist noted that throughout Pinson's incarceration in the Bureau of Prisons

("BOP"), she regularly received individual counseling and has continued to engage

in self-harm (cutting wrists, swallowing pills, injuring vessels in nose, cutting

testicles).  Id. ¶ 35.)  Pinson denied suicidal ideation and any thoughts of self-harm

or significant distressing emotions.  (Id. ¶ 36.)  The psychologist noted her current

concerns as Pinson engaging in self-harm due to poor distress tolerance and

perceived lack of control.  (Id. ¶ 37.)  The psychologist also noted two occasions

prior to Pinson's arrival at USP-Allenwood, where Pinson engaged in genitalia

---

[2] DBT is behavior therapy used to identify obstacles to changing emotions; reduce vulnerability
to emotional mind; increase positive emotional events; increase mindfulness to current emotions;
apply distress tolerance techniques.  (Doc. No. 31 ¶ 34, n.4.)

mutilation for being distressed over having a penis rather than a vagina.  (Id. ¶ 38.)
The psychology screening notes indicate that it was recommended that Pinson was
cleared for general population, but that she was being placed in the SHU until
cleared by custody.  (Id. ¶ 39.)  It was also recommended by the psychologist that
Pinson have a cellmate as a protective factor.  (Id. ¶ 40.)

Pinson was determined to be a care level 3 mental health inmate, and per
policy, was required to be seen weekly and in a private session.  (Id. ¶¶41, 42.)
The psychologist noted that she frequently saw Pinson more than once a week and
that Pinson would often claim suicidal thoughts in order to be seen by the
psychologist but then would focus on things such as personal property or hygiene
items.  (Id. ¶ 43, 44.)  The psychologist concluded in these instances that there
were no genuine suicidal thoughts or intent to self-harm, but rather, attempts to
manipulate staff in order to obtain things Pinson wanted, noting that a true suicidal
inmate would not have concerns about hygiene items or personal property items.
(Id. ¶¶ 45, 46.)

On March 11, 2016, the psychologist saw Pinson at Pinson's request.  (Id. ¶
47.)  In the private session, Pinson discussed her belief that she did better having a
cellmate (which she was provided upon placement in the SHU), and the
psychologist noted that Pinson's thought process was logical, coherent, and goal
oriented.  (Id. ¶¶ 47, 48.)  The psychologist noted that Pinson denied

suicidal/homicidal, or self-injurious behavior ideation, intention or plan. (Id. ¶ 49.) The psychologist met with Pinson again on March 15, 2017, wherein Pinson's safety concerns regarding entering general population and her desire to remain in the SHU were discussed. (Id. ¶ 50.) Pinson also reported that she wanted to be transferred to another facility and that she wanted her property, mainly her female undergarments. (Id. ¶ 51.) The psychologist discussed coping skills with Pinson and noted that she had a more positive outlook since first arriving at USP-Allenwood. (Id. ¶¶ 52, 54.)

On March 17, 2016, Pinson was seen by Dr. Elisabete Santos (now known as Dr. Stahl), a physician employed by the Federal BOP and the Clinical Director assigned to the Allenwood Federal Correctional Complex (FCC-Allenwood), to assist in co-managing treatment for Pinson's gender dysphoria diagnosis. (Id. ¶¶ 12, 55.) As Clinical Director, Dr. Stahl serves as the primary physician for a range of medical services provided to inmates housed at FCC Allenwood and serves as the clinical supervisor for approximately forty health care staff. (Id. ¶¶ 13, 14.) In addition to administrative duties, Dr. Stahl follows a panel of patients she personally sees for their Chronic Care Clinic evaluations every six to twelve months or more, as clinically indicated. (Id. ¶ 15.)

Dr. Stahl also serves as the Chair of the BOP's Transgender Clinical Core Consultant Team ("TCCT"), which provides guidance/consultation services to

BOP clinical staff treating inmates with transgender concerns.  (Id. ¶¶ 16, 20.)

TCCT members had been educated on the Endocrine Society Clinical Practice

Guideline, the only published Trans Health Guideline at the time.  (Id. ¶ 17.)

Members of the TCCT also attended multiple Trans Health medical conferences to

gain the knowledge necessary to develop a BOP Guideline.  (Id. ¶ 18.)

In 2014, the BOP released an Interim Resource Guide to help educate all

BOP staff in the unique needs of all transgender inmates.  (Id. ¶ 19.)  However,

during the four month period of time Pinson was incarcerated at USP-Allenwood,

the BOP did not have any clinical guidelines in place for treating transgender

inmates with gender dysphoria.  (Id. ¶ 22.)  It was not until December 2016 that the

BOP Guideline on this subject was released.[3]  (Id. ¶ 23.)

Community standards considered for treatment were provided to Pinson and

included those set forth by the World Professional Association for Transgender

Health ("WPATH").  (Id. ¶ 24.)  The WPATH standards "are an information

resource which may provide guidance on medical and mental health treatment,

which may include education, counseling, medical evaluations, hormone

treatments, 'real-life' experience, and, in some but not all cases, sexual

reassignment surgery."  (Id. ¶ 25.)  WPATH's eligibility criteria for the sexual

---

[3] The guideline, titled "Medical Management of Transgender Inmates" was submitted to the
Court by Pinson with a motion requesting that this Court take judicial notice of it. (Doc. No. 18;
Doc. No. 31 ¶ 23, n.2).  The Court granted the motion on August 3, 2017.  (Doc. No. 24.)

reassignment surgery includes a well documented gender dysphoria[4], capacity to consent to treatment, age of majority, twelve months of feminizing hormone therapy, and twelve months of continuous living in the gender role that is congruent with one's gender. (Id. ¶ 26.) The WPATH recommends two letters of support from treatment providers to support the surgery, typically one letter from a psychologist/clinical social worker, and one letter from the medical provider. (Id. ¶ 27.) The WPATH recommends that if there are psychological and/or medical problems, these must be "reasonably well controlled" prior to consideration for surgical transitioning. (Id. ¶ 28.)

During the March 17, 2016 meeting with Pinson, Dr. Stahl noted that Pinson was trans-female on an Estradiol patch (a feminizing hormone used to enhance feminine characteristics) that had been started on December 27, 2015 at a previous institution. (Id. ¶¶ 56, 59.) Dr. Stahl also noted that Pinson's subjective description of history including gravitating toward girl activities and her unfamiliarity with the concept of "trans" as a teen and associating it with being homosexual. (Id. ¶ 57.) Pinson also stated having been in prison since the age of 17, which was when she started to cut herself, including genitalia. (Id. ¶ 58.)

_____

[4] Gender dysphoria is defined in the BOP's Transgender Resource Guide as "A strong and persistent cross-gender identification. It is manifested by a stated desire to be the opposite sex and persistent discomfort with his or her biologically assigned sex." (Doc. No. 31 ¶ 26, n.3.)

Pinson was seen by a psychologist on March 18, 2016, wherein the psychologist notes that Pinson reported no mental health concerns and SHU staff reported no observed mental health problems or issues. (Id. ¶ 60.) On March 22, 2016, Pinson expressed feelings of relief and satisfaction with the current cellmate to psychology, indicating how having a positive cellmate helps avoid self-injurious behavior. (Id. ¶¶ 61, 62.) The psychologist noted that Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan. (Id. ¶ 63.)

An evaluation was also performed by a psychiatrist on March 22, 2016. (Id. ¶ 64.) The psychiatrist documented that Pinson had a history of anxiety and had previously received Ativan. (Id. ¶ 65.) The psychiatrist prescribed Perphenazine for anti-social personality disorder and Trihexyphenidyl used for the side effects of Perphenazine (tremors). (Id. ¶ 66.) Pinson was seen by the psychologist on April 5, 2016, wherein Pinson reported mood swings since switching to new estrogen medication but denied suicidal/homicidal/self injurious behavior ideation, intention, or plan. (Id. ¶ 67, 68.) On April 11, 2016, the psychologist noted that Pinson met criteria to be considered a care level 3 mental health inmate requiring enhanced outpatient mental health care and would be seen weekly. (Id. ¶ 69.) The psychologist further noted that Pinson threatens to sue staff and engage in self harming behaviors when frustrated and is prescribed anti-psychotic medication. (Id. ¶¶ 70, 71.) In reviewing the April 11, 2016 notes, the psychologist comments

that Pinson is an inmate who would attempt to manipulate staff by threatening suicide or self-harm in order to achieve secondary gain and that the psychologist exerted great effort in balancing the dual goals of keeping Pinson safe while also providing treatment and being sensitive to the unique needs of an inmate with Gender Dysphoria-Transgender.  (Id. ¶¶ 72-74.)

On April 14, 2016, Pinson was released from the SHU to the general population to participate in the Challenge Program.[5]  (Id. ¶¶ 4, 6.)  On April 18, 2016, Pinson reported a Prison Rape Elimination Act ("PREA") incident that occurred on the housing unit between Pinson's cellmate and another inmate.  (Id. ¶ 75.)  On April 21, 2016, it was noted that Pinson had recently been released to the compound from the SHU, and that she was adjusting to living in open space versus being locked down, going to the yard to exercise, cooking food and socializing in the unit.  (Id. ¶¶ 77, 78.)  The psychologist noted that Pinson's coping skills were reviewed and that she denied suicidal/homicidal, or self-injurious behavior ideation, intention or plan.  (Id. ¶ 80.)

On April 25, 2016, the psychologist noted that Pinson continued to adjust to the compound and was looking for a job.  (Id. ¶ 81.)  The psychologist noted that Pinson was happy with her mentor assignment and the importance of taking the

_____

[5] The Challenge Program is a residential program designed by the BOP to meet the treatment needs of the high security inmates who have substance abuse and mental health disorders.  The program encourages a healthy and crime free approach to life.  The program also allows inmates to work together to create a community that supports pro-social attitudes and behaviors.  (Doc. No. 31 at 2.)

medications as prescribed was also discussed with Pinson. (Id. ¶¶ 82, 83.) Coping skills were discussed and the psychologist noted that Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan. (Id. ¶ 84.)

Pinson reported to the psychologist on May 2, 2016 that her adjustment to the compound was "going great," that she had a job in the kitchen washing pots and pans, and that she was continuing to do legal work to stay busy and focused. (Id. ¶¶ 85, 86.) The psychologist further noted that Pinson was transitioning well to general population and that she denied suicidal/homicidal, or self-injurious behavior ideation, intention or plan. (Id. ¶¶ 88, 89.) On May 9, 2016, the psychologist again met with Pinson who reported that her prior week was good and that she enjoyed working in the kitchen and liked general population. (Id. ¶ 90.) They further discussed available programs offered at USP Terre Haute and at USP Allenwood. (Id. ¶ 91.) Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan. (Id. ¶ 92.)

Later that day, the Chief Psychologist was notified by a Special Investigative Agent ("SIA") that Pinson had reported allegations related to PREA. (Id. ¶ 93.) The Chief Psychologist met with Pinson, wherein Pinson claimed that another inmate threatened to "pimp" out her and her cellmate. (Id. ¶ 94.) A lieutenant determined it was appropriate for Pinson to be housed in the SHU temporarily

while an investigation was performed to assess Pinson's safety in open population. (Id. ¶ 96.)

On May 13, 2016, a psychologist performed a Suicide Risk Assessment of Pinson at the request of the Chief Psychologist. (Id. ¶ 97.) In the Suicide Risk Assessment, the psychologist recounted Pinson's history and current problems were listed as "extreme inward emotional pain and frustration," that she does not want to live anymore, that she hated being "placed back in a box" (SHU), and that she has urges to cut. (Id. ¶¶ 98, 99, 103.) The psychologist reminded Pinson that the PREA allegations needed to be investigated and that was the reason why she was placed in SHU. (Id. ¶ 100.) The psychologist noted risk and protective factors assessed and further noted Pinson's current suicide risk at the time as being "moderate" and "present." (Id. ¶ 101, 102.) A formal suicide watch was initiated for Pinson via the use of inmate suicide watch companions and that while on suicide watch, a psychologist would evaluate Pinson on a daily basis. (Id. ¶ 104, 106.) It was further noted that inmates on suicide watch are not permitted to shave and do not receive shaving razors. (Id. ¶ 107.)

On May 14, 2016, a psychologist had an encounter with Pinson but Pinson refused to come to the door and was uncooperative. (Id. ¶ 108.) It was noted that Pinson was being watched by an inmate companion and that Pinson should stay on suicide watch. (Id. ¶ 109.) On May 15, 2016, a psychologist reviewed Pinson and

noted that her "affect was normal and mood was euthymic," and that she denied suicidal and/or homicidal ideation intent.  (Id. ¶¶ 110, 111.)  The psychologist further provided that there were no clinical indications that Pinson was in danger of self-harm at the time and that Pinson reported working closely with a primary psychologist and was upset following placement in SHU due to the fact that emotions oscillate as a result of hormone therapy.  (Id. ¶¶ 112, 113.)  Pinson stated that the reason she did not want to talk to the psychologist the day before was because she was cold and wanted to stay under the blanket.  (Id. ¶ 114.)  Pinson further explained that at the time of the initial assessment, she was very upset about being placed in the SHU.  (Id. ¶ 115.)  The psychologist concluded that given Pinson's presentation, willingness to engage in the assessment process, level of cooperativeness and future orientation, and talking and joking with the inmate companion, there was no reason to continue suicide watch placement.  (Id. ¶ 116.)  The psychologist further noted that Pinson's mental health status was within normal limits, that Pinson had a safety plan in place and would follow it if there were any thoughts of self-harm.  (Id. ¶ 118.)

When seen again on May 17, 2016 by a psychologist, Pinson expressed annoyance for being placed in SHU for reporting the PREA incident.  (Id. ¶ 119.)  Pinson stated that she hated being in isolation and described that she is on an "emotional roller coaster."  (Id. ¶ 120.)  The psychologist reviewed impulsivity and

skills used to refrain from urges to cut and noted that Pinson denied suicidal/homicidal or self-injurious behavior ideation, intention or plan. (Id. ¶¶ 122, 123.)

On May 18, 2016, Pinson reported urges of cutting the night before and surrendered a razor to the psychologist. (Id. ¶ 124.) Pinson reported being stressed and having mood swings. (Id. ¶ 125.) The psychologist screened Pinson for a variety of empirically validated factors commonly associated with risk for self-harm and suicide. (Id. ¶ 126.) The psychologist noted that Pinson expressed thoughts of cutting the night before but that the thoughts had not returned. (Id. ¶ 127.) The psychologist noted that prior records indicate that Pinson's behavior was driven by attempts to control the conditions of confinement, which Pinson admitted to being true in some instances, but at times, has used self harm as a means of releasing frustration. (Id. ¶¶ 128, 129.) The psychologist noted that Pinson displayed future orientation during the interview and also provided that Pinson's focus and concern for property items suggested to the psychologist that Pinson was not suicidal but rather was using the threat of self-harm to manipulate psychology services to obtain what she wanted. (Id. ¶¶ 131, 132.) The psychologist considered Pinson to be a low risk of suicide so suicide watch was not warranted at the time. (Id. ¶ 133.)

On May 19, 2016, the SHU lieutenant contacted psychology and indicated that Pinson was potentially suicidal. (<u>Id.</u> ¶ 134.) On evaluation, Pinson stated that she was irritable and stressed over the pending PREA investigation as well as irritated for being told by the Warden that she was manipulating staff. (<u>Id.</u> ¶¶ 135, 136.) Pinson also stated that she was feeling dramatic and pissed and stated that extreme measures would be taken if necessary if SIS took weeks to complete its investigation. (<u>Id.</u> ¶ 137.) The psychologist provided that Pinson denied any present suicidal thoughts or the need to go on suicide watch and noted Pinson was low risk for suicide and suicide was not warranted. (<u>Id.</u> ¶¶ 139, 140.) The psychologist further provided that it was her perception from the interaction with Pinson that this was another attempt to manipulate staff. (<u>Id.</u> ¶ 141.) The psychologist also believes that Pinson was using this manipulation in order to see psychology more than once a week. (<u>Id.</u> ¶ 142.) The psychologist also noted that Pinson's focus on the Care Level 3 incentive items suggested that Pinson was not truly suicidal or at risk for self-harm but rather, was using the threat to obtain secondary gain including increased contacts with psychology and a return of Care Level 3 incentive items. (<u>Id.</u> ¶ 143.)

On May 24, 2016, Pinson told a psychologist that she was "preparing for war" and reported staff as being "rude and dismissive." (<u>Id.</u> ¶ 144.) Pinson also requested an increase in medication and that Ativan be prescribed. (<u>Id.</u> ¶ 145.)

The psychologist noted that Pinson's thought process was logical, coherent, and goal oriented, and that she denied suicidal/homicidal/self-injurious behavior ideation, intention or plan. (Id. ¶¶ 147, 148.) The psychologist believed that this encounter was another attempt by Pinson to manipulate the conditions of confinement to obtain an increased dosage in a prescription and to obtain additional medication/Ativan and that Pinson's discussion that day regarding the Transgender Law Center suggested that she was not a suicide risk or a risk of self-harm. (Id. ¶¶ 149, 150.)

On May 25, 2016, at 12:30 p.m., a lieutenant making rounds in the SHU where Pinson was housed discovered Pinson cutting her left arm with a razor. (Id. ¶ 187.) Pinson flushed the razor in the toilet and complied with staff orders by submitting to hand restraints. (Id. ¶ 188.) Pinson was removed from the cell, pat searched, metal detected, photographed, and escorted to Health Services for treatment. (Id. ¶ 189.) Pinson sustained multiple lacerations to her left arm, left leg, front and back of the head, scrotum, and tongue, and was transported to a local hospital for further treatment. (Id. ¶¶ 190, 191.) Pinson was interviewed by psychology staff and it was determined that a formal suicide watch was warranted. (Id. ¶. 192.)

The USP-Allenwood psychologist provided that Pinson was closely monitored since arriving at USP-Allenwood, and that at the time of the May 25,

2016 incident, there were no objective or clinical indication that Pinson was a risk for a suicide attempt or self-injury. (Id. ¶¶ 151, 152.) Pinson's medical record from March 1, 2016 through August 1, 2016, is in excess of 500 pages, and while housed at USP-Allenwood for approximately twenty weeks, was seen in person for clinical encounters by five different medical providers on thirteen different occasions. (Id. ¶¶ 153, 154.) Pinson's medical record from practitioners who addressed a variety of issues consists of twenty-one administrative notes. (Id. ¶ 155.) Additionally, Dr. Stahl, while only involved in Pinson's medical care as a consultant in the co-management of Pinson's trans-health, saw Pinson on at least three occasions and provided input to other clinicians who were seeing Pinson on a regular basis. (Id. ¶¶ 156, 157.)

With regard to Defendant Magyar, Magyar is an Assistant Health Service Administrator ("AHSA") at USP-Allenwood. (Id. ¶ 159.) As the AHSA, Magyar serves as an advisor to the administration regarding overall administrative management and operations of health services, supervises staff assigned to the medical department in the performance of their non-clinical duties, and responds to inmate grievances submitted in the form of administrative remedies. (Id. ¶¶ 161, 162, 167.) Magyar's duties do not include, however, providing medical or dental care to inmates. (Id. ¶ 160.)

On June 5, 2016, Pinson submitted an informal resolution form to the unit team, which states, "I want to know if the BOP offers sex reassignment surgery to its inmates, yes or no," which was referred to Magyar for a response. (Id. ¶¶ 169, 170.) On June 30, 2016, Magyar responded:

> According to the [WPATH], criteria for Gender Confirming Surgery includes Persistent well-documented gender dysphoria, Capacity to consent to treatment, Age of Majority, Twelve months of feminizing hormone therapy, and 12 months of continuous living in the gender role that is congruent with one's gender. In addition, the WPATH recommends full clinical evaluations to be done by a licensed Psychiatrist/Psychologist, and Medical Doctor to document stable psychiatric and medical problems and "readiness" for extensive surgical interventions. The BOP does not have any policy that prohibits sex affirming surgery, and provides individualized psychological/medical care to all individuals, including Feminizing/Masculinizing hormone regimens and supportive psychological treatment according to community standards.

> According to your medical record you were just started on feminizing hormone therapy in January of 2016. Your hormone levels are not at expected goals just yet; This does not meet WPATH's criteria for sex affirming surgery, which recommends a full 12 months of "feminizing hormone therapy". Because of your severe anxiety, and several self mutilation episodes requiring hospitalization, and other security concerns (beyond the control of your treatment team) you were only living in general population for a very short time, and therefore not able to live "in the gender role that is congruent with one's gender." Your psychiatric illness, despite nearly daily interactions with a licensed Psychologist, and evaluations by a Psychiatrist is not yet well controlled. Given current standards of practice, you are not yet meeting criteria for sex affirming surgery.

> You are receiving appropriate medical care in accordance with your clinical assessments. If your condition has changed or worsened, please report to sick-call to have your concerns appropriately addressed by your Primary Care Provider.

(Id. ¶ 171.)

With regard to Pinson's ineligibility for sexual reassignment surgery, Dr. Stahl provides that Pinson was provided treatment pursuant to community standards. (Id. ¶ 172.) Pinson's hormone therapy was initiated in December 2015 prior to arriving to USP-Allenwood, and after Pinson's arrival, a combined effort by health services and psychology services confirmed Pinson's diagnosis of gender dysphoria and hormone affirming therapy was continued and adjusted as deemed necessary with Pinson's consent. (Id. ¶¶ 173, 174.) Pinson's hormone levels were sub-therapeutic on arrival at USP-Allenwood and several adjustments were required to improve the hormone levels. (Id. ¶ 175.) Pinson did not meet the clinical criteria for gender affirming surgery while confined at USP-Allenwood because hormone levels were still sub-therapeutic despite being on feminizing hormone therapy for over one year. (Id. ¶ 176.) Pinson also did not meet the clinical criteria for surgery because Pinson had not been able to socially transition into a female role by continuously living in the gender role that is congruent with the identified female gender (a required WPATH step for vaginoplasty). (Id. ¶ 177.)

Additionally, there were several concerns with respect to Pinson's physical and mental health, which must be "reasonably well-controlled" prior to consideration for surgery according to WPATH. (Id. ¶ 178.) As Pinson's medical provider at the time, Dr. Stahl would not have clinically supported gender affirming surgery for a variety of reasons, including: Pinson's hormone levels were nowhere close to female physiologic levels; Pinson was not fully compliant with all aspects of treatment; Pinson did not always comply with wound care and other aspects of treatment; Pinson was experiencing severe anxiety and oppositional behavior which was not "reasonably controlled" and would have precluded vaginoplasty surgery at that time. (Id. ¶¶ 179-183.) Dr. Stahl provided that Pinson was simply not a surgical candidate while confined to USP-Allenwood. (Id. ¶ 184.)

Moreover, Dr. Stahl states that Pinson was provided extensive, supportive and compassionate care by health services and psychology services while at USP-Allenwood and Pinson, while confined at USP-Allenwood, did not meet the current WPATH criteria for gender affirming surgery. (Id. ¶¶ 185, 186.)

As for Defendant Frei's involvement, Frei is employed by the BOP as a Correctional Officer at USP-Allenwood. (Id. ¶ 194.) His quarterly assignment from March 13 to June 11, 2016, was working the SHU "number three post" with hours of duty from 13:45 to 21:45, and his days off were Sunday and Monday. (Id.

¶¶ 195-197.)  BOP Program Statement 5270.10, SHU, provides that disposable shaving razors are offered and passed out to inmates three days a week.  (Id. ¶ 198.)  Inmates receive razors on Monday, Wednesday, and Friday.  (Id. ¶ 199.)  Because Frei was off on Mondays, he would provide razors to inmates who requested them on Wednesdays and Fridays.  (Id. ¶ 200.)  While BOP policy does not require officers to maintain logs to keep track of razors, Frei utilized an informal log to monitor and track who was provided razors in order to assure they were all collected/returned, which is usually destroyed after thirty days.  (Id. ¶¶ 201-203.)  A list of inmates who were on razor restrictions would be provided to the Number Three Officer by Psychology Services.  (Id. ¶ 204.)  Staff maintain a board in the SHU to track which inmates are housed there, razor restrictions, and other relevant information, and utilized a magnetic marker placed on the board of inmates who were on razor restriction.  (Id. ¶¶ 205, 206.)

Frei would pass razors out shortly after reporting for duty, give the inmates an hour to shave before collecting the razors, and mark the log that the razors had been collected/returned.  (Id. ¶ 207.)  Frei would assure that the razor and blade was intact when collected and after collected, the razors were placed into a box that went into the "hot trash" which was emptied only by staff.  (Id. ¶¶ 208, 209.)  If an inmate refused to return a razor, Frei would immediately contact the lieutenant.  (Id. ¶ 210.)  Pinson never refused to return a shaving razor to Frei.  (Id. ¶ 211.)

Each and every time razors were distributed by Frei, they were returned and confirmed to be intact.  (Id. ¶ 212.)  Frei was not involved in any aspect of Pinson's medical or psychology care and he was unaware of any diagnosis of Pinson.  (Id. ¶ 213, 214.)

Pinson was not on any type of razor restrictions from the time she was placed in the SHU on May 9, 2016, until May 25, 2016.  (Id. ¶ 216.)  Prior to the May 25, 2016 incident, there was no reason Pinson could not be provided a shaving razor like other inmates in the SHU.  (Id. ¶ 217.)  Frei was not present when Pinson was discovered cutting herself at 12:30 p.m. on May 25, 2016, as it was prior to his reporting for duty that day.  (Id. ¶ 218.)  Frei did not come into work until 1:45 p.m. and did not pass out razors until after 2:00 p.m.  (Id. ¶ 219.)  Because May 25, 2016 was a Wednesday and Officer Frei is off on Mondays, the most recent time Frei would have passed out razors prior to 2:00 that day would have been five days earlier, on Friday, May 20, 2016.  (Id. ¶ 220.)  Pinson never told Frei of any intentions to cut out Pinson's testicles.  (Id. ¶ 221.)  Frei denies ever stating to Pinson that he did not care if Pinson cut the testicles out or that he goes home after eight hours regardless.  (Id. ¶ 222.)

Finally, once the SIS investigation was completed, it was determined that Pinson should be transferred to another facility.  (Id. ¶ 9.)  Pinson was transferred to USP Terre Haute on July 18, 2016.  (Id. ¶ 10.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the

nonmoving party may not rest on the unsubstantiated allegations of his or her

pleadings. When the party seeking summary judgment satisfies its burden under

Rule 56 of identifying evidence which demonstrates the absence of a genuine issue

of material fact, the nonmoving party is required by Rule 56 to go beyond his

pleadings with affidavits, depositions, answers to interrogatories or the like in

order to demonstrate specific material facts which give rise to a genuine issue.

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion

"must do more than simply show that there is some metaphysical doubt as to the

material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586

(1986). When Rule 56 shifts the burden of production to the nonmoving party, that

party must produce evidence to show the existence of every element essential to its

case which it bears the burden of proving at trial, for "a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp.,

967 F.2d 846, 851 (3d Cir. 1992). In particular, a plaintiff cannot avoid summary

judgment by simply relying upon a self-declaration that he has authored which

relies not on evidence, but on the plaintiff's own interpretation of events and,

essentially, opinion testimony. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871,

888 (1990) (the non-moving party may not defeat a properly supported summary

judgment motion by simply substituting the "conclusory allegations of the

complaint or answer with the conclusory allegations of an affidavit."); <u>Iseley v. Beard</u>, Civ. No. 02-2006, 2009 U.S. Dist. LEXIS 52014, at *32 (M.D. Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence cannot be accepted as true).

The court must also consider the evidence in the light most favorable to the nonmoving party. <u>White</u>, 862 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. <u>Id.</u> (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a <u>pro se</u> litigant. These rules apply with equal force to all parties. <u>See</u> <u>Sanders v. Beard</u>, Civ. No. 09-1384, 2010 U.S. Dist. LEXIS, at *15 (M.D. Pa. July 20, 2010) (stating that <u>pro se</u> parties "are not excused from complying with court orders and the local rules of court"); <u>Thomas v. Norris</u>, Civ. No. 02 -01854, 2006 U.S. Dist.

LEXIS 64347, at *11 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties must follow the Federal Rules of Civil Procedure).

## III. DISCUSSION

Pinson claims that Defendants violated her rights under the Eighth Amendment to the United States Constitution by displaying "deliberate indifference" to her serious medical needs, and that the United States, under her FTCA claim, was negligent when Officer Frei provided her a razor. The Court addresses these arguments in turn.

### A. Eighth Amendment Claim

"A Bivens action, which is the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff's rights under color of federal law." Brown v. Philip Morris Inc., 250 F.3d 789, 800 (3d Cir. 2001). Specifically,

> Bivens creates no substantive rights, but rather allows "a citizen suffering a compensable injury to a constitutionally protected interest [to] invoke the general federal-question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." . . . To state a claim under Bivens, the plaintiff must show that the defendant, acting under color of Federal law, deprived him of a right secured by the Constitution or laws of the United States.

Naranjo v. Martinez, Civ. No. 408-1755, 2009 WL 4268598, at *6 (M.D. Pa. Nov. 24, 2009) (citations omitted). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth

Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Corr. Facil., 318 F.3d 575, 582 (3d Cir. 2003). Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also Peterson v. Knauer, No. 03-5368, 2008 WL 509207, at *3 (E.D. Pa. Feb. 25, 2008) (explaining that the "the refusal to administer pain medication contrary to a surgeon's orders" may constitute deliberate indifference). The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Circumstantial evidence can establish subjective knowledge if it

shows that the excessive risk was so obvious that the official must have known about it.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 842)).

The second prong of the Eighth Amendment inquiry is whether the plaintiff's medical needs were serious.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). Not every condition is a serious medical need; instead, the serious medical need element contemplates a condition of urgency, namely, one that may produce death, degeneration, or extreme pain.  See id.

Moreover, because only egregious acts or omissions can violate this standard, mere medical malpractice cannot result in an Eighth Amendment violation.  White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990); Estelle, 429 U.S. at 106 ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  The Supreme Court has held that negligence or inadvertence alone do not rise to the level of a constitutional violation.  Whitley v. Albers, 475 U.S. 312 (1986).  In Daniels v. Williams, 474 U.S. 327 (1986), the Court noted that "[l]ack of due care suggest no more than a failure to measure up to the conduct of a reasonable person."  Where a state of

mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations. Wilson v. Seiter, 501 U.S. 294 (1991).

Additionally, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, see Young v. Kazmerski, 266 F. App'x 191, 194 (3d Cir. 2008), and a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See White, 897 F.2d at 108-10. Furthermore, it is well settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim. See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-25 (7th Cir. 1996); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir.1994); Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); Pearson v. Prison Health Servs., 850 F.3d 528, 535 (3d Cir. 2017) ("[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care.").

### i. AHSA Magyar

Pinson claims that Magyar denied her the requested sex reassignment surgery. Pinson further claims in her brief in opposition to Defendants' motion for summary judgment, that Magyar "actively participated in the deliberations on whether to deny plaintiff the requested surgery." (Doc. No. 47 at 5.) However, liability may not be imposed under the traditional standard of respondeat superior. Capone v. Marinelli, 868 F.2d 102, 106 (3d Cir. 1989) (citing Hampton v. Holmesburg Prison Officials, 546 F.2d 1017, 1082 (3d Cir. 1976)). Rather, "[b]ecause vicarious liability is inapplicable to Bivens . . . a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556, U.S. 662, 676 (2009).

Moreover, the Third Circuit has held that prison officials who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir.1993). In Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004), the Third Circuit expanded upon its reasoning in Durmer, as follows:

> Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable

with the Eighth Amendment scienter requirement of deliberate
indifference

Id. at 236.

Finally, inmates do not have a constitutionally protected right to a grievance
procedure. See Jones v. N. C. Prisoners' Labor Union, Inc., 433 U.S. 119, 137-138
(1977) (providing that the law is well settled that there is no constitutional right to
a grievance procedure). Even if the prison provides for a grievance procedure, as
the BOP does, violations of those procedures do not amount to a civil rights cause
of action. Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988), cert denied, 488
U.S. 898 (1988); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)
(finding that a supervisory defendant, who, after being informed of the violation
through the filing of grievances, reports or appeals, failed to take action to remedy
the alleged wrong was not enough to show that the defendant had the necessary
personal involvement).

Here, the undisputed facts show that Pinson submitted an informal resolution
on June 5, 2016, stating, "I want to know if the BOP offers sex reassignment
surgery to its inmates, yes or no." (Doc. No. 31 ¶ 169.) On June 30, 2016, Magyar
responded:

    According to the [WPATH], criteria for Gender Confirming
    Surgery includes Persistent well-documented gender dysphoria,
    Capacity to consent to treatment, Age of Majority, Twelve
    months of feminizing hormone therapy, and 12 months of
    continuous living in the gender role that is congruent with one's

gender. In addition, the WPATH recommends full clinical evaluations to be done by a licensed Psychiatrist/Psychologist, and Medical Doctor to document stable psychiatric and medical problems and "readiness" for extensive surgical interventions. The BOP does not have any policy that prohibits sex affirming surgery, and provides individualized psychological/medical care to all individuals, including Feminizing/Masculinizing hormone regimens and supportive psychological treatment according to community standards.

According to your medical record you were just started on feminizing hormone therapy in January of 2016. Your hormone levels are not at expected goals just yet; This does not meet WPATH's criteria for sex affirming surgery, which recommends a full 12 months of "feminizing hormone therapy". Because of your severe anxiety, and several self mutilation episodes requiring hospitalization, and other security concerns (beyond the control of your treatment team) you were only living in general population for a very short time, and therefore not able to live "in the gender role that is congruent with one's gender." Your psychiatric illness, despite nearly daily interactions with a licensed Psychologist, and evaluations by a Psychiatrist is not yet well controlled. Given current standards of practice, you are not yet meeting criteria for sex affirming surgery.

You are receiving appropriate medical care in accordance with your clinical assessments. If your condition has changed or worsened, please report to sick-call to have your concerns appropriately addressed by your Primary Care Provider.

(Id. ¶ 171.)

The Court does not find that these facts indicate that Magyar acted with deliberate indifference to the serious medical needs of Pinson. For instance, Magyar was responsive to Pinson's grievance. Moreover, Magyar was neither responsible, nor involved in the decision to deny Pinson the sex reassignment

surgery in any way other than responding to the grievance.  Indeed, Pinson alleges

in her amended complaint that Magyar's "response was actually the decision of

[Dr. Stahl]."  (Doc. No. 11 at 3.)  It is well-settled that if a grievance official's only

involvement is investigating and/or ruling on an inmate's grievance after the

incident giving rise to the grievance has already occurred, there is no personal

involvement on the part of that official.  <u>Rode</u>, 845 F.2d at 1208.

Finally, the undisputed evidence shows that Pinson was being treated for

trans-health by a number of individuals from USP-Allenwood's medical staff.

Absent a reason to believe that Pinson's doctors or their assistants were mistreating

Pinson, Magyar, a non-medical prison official, cannot be chargeable with the

Eighth Amendment scienter requirement of deliberate indifference.  <u>See</u> <u>Spruill</u>,

372 F.3d at 236.  Accordingly, the Defendants' motion for summary judgment will

be granted as to Defendant Magyar.[6]

### ii.    Dr. Stahl

Dr. Stahl contends that she was not deliberately indifferent to Plaintiff's

medical needs.  (Doc. No. 29 at 27.)  The evidence submitted in support of

Defendants' motion for summary judgment supports this contention.  With regard

to Pinson's ineligibility for sexual reassignment surgery, Dr. Stahl provides that

---

[6] It appears that Pinson attempts to add a retaliation claim against Magyar by way of her brief in
opposition to Defendants' motion for summary judgment.  (Doc. No. 47 at 6.)  However, Pinson
may not amend her complaint through amendment in a brief in opposition to a motion for
summary judgment.  <u>See</u> <u>Rankin v. Bledsoe</u>, Civ. No. 11-2352, 2015 WL 5882318, at *6 (M.D.
Pa. Oct. 5, 2015) (citing <u>Bell v. City of Phila.</u>, 275 F. App'x 157, 160 (3d Cir. 2008)).

Pinson was provided treatment pursuant to community standards. (Doc. No. 31 ¶ 172.) Pinson's hormone therapy was initiated in December 2015 prior to arriving to USP-Allenwood, and after Pinson's arrival, a combined effort by health services and psychology services confirmed Pinson's diagnosis of gender dysphoria and hormone affirming therapy was continued and adjusted as deemed necessary with Pinson's consent. (Id. ¶¶ 173, 174.) Pinson's hormone levels were sub-therapeutic on arrival at USP-Allenwood and several adjustments were required to improve the hormone levels. (Id. ¶ 175.) Pinson did not meet the clinical criteria for gender affirming surgery while confined at USP-Allenwood because hormone levels were still sub-therapeutic despite being on feminizing hormone therapy for over one year. (Id. ¶ 176.) Pinson also did not meet the clinical criteria for surgery because Pinson had not been able to socially transition into a female role by continuously living in the gender role that is congruent with the identified female gender (a required WPATH step for vaginoplasty). (Id. ¶ 177.)

Additionally, there were several concerns with respect to Pinson's physical and mental health, which must be "reasonably well-controlled" prior to consideration for surgery according to WPATH. (Id. ¶ 178.) As Pinson's medical provider at the time, Dr. Stahl would not have clinically supported gender affirming surgery for a variety of reasons, including: Pinson's hormone levels were nowhere close to female physiologic levels; Pinson was not fully compliant with

all aspects of treatment; Pinson did not always comply with wound care and other aspects of treatment; Pinson was experiencing severe anxiety and oppositional behavior which was not "reasonably controlled" and would have precluded vaginoplasty surgery at that time. (Id. ¶¶ 179-183.) Dr. Stahl provided that Pinson was simply not a surgical candidate while confined to USP-Allenwood because Pinson did not meet the current WPATH criteria for gender affirming surgery. (Id. ¶¶ 184-86.)

Plaintiff's allegation amounts to, at most, a disagreement with Defendant Stahl's treatment decisions. However, a showing of deliberate indifference requires more. See Taylor, 36 F. App'x at 229; Brown, 903 F.2d at 278 ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights"); Pearson, 850 F.3d at 535. Here, the record is clear that Defendant Stahl has provided Pinson with appropriate medical treatment. Pinson's dissatisfaction with Dr. Stahl's professional judgment simply does not rise to a constitutional violation. See Youngberg v. Romeo, 457 U.S. 307, 322-23 (1982). Accordingly, summary judgment will be granted in Dr. Stahl's favor.[7]

---

[7] In light of the Court's foregoing conclusions, it is unnecessary to address Defendants' arguments relating to qualified immunity and injunctive relief since the Court has found no Constitutional violation and both issues are moot. See Wright v. City of Phila., 409 F.3d 595, 600 (3d Cir. 2005) (providing that if there is no constitutional violation, there is no reason to reach the qualified immunity issue).

## B.      FTCA Claim

The FTCA "provides a mechanism for bringing a state law tort action against the federal government in federal court" and the "extent of the United States' liability under the FTCA is generally determined by reference to state law." In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 362 (3d Cir. 2001) (quoting Molzof v. United States, 502 U.S. 301, 305 (1992)). Where a federal court is presented with a claim brought under the FTCA, it applies the law of the state in which the alleged tortious conduct occurred. 28 U.S.C. § 1346(b). In this case, the allegedly tortious conduct occurred in Pennsylvania, and thus the Court refers to Pennsylvania tort law to assess the extent of the United States' potential liability on Pinson's remaining claim.

Under Pennsylvania law, in order to "establish a cause of action for negligence, the plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." Northwest Mutual Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2005) (citing Pittsburgh Nat'l Bank v. Perr, 637 A.2d 334, 336 (Pa. Super. Ct.1994)). In accordance with this standard, a plaintiff bears the burden of proving by a preponderance of the evidence that the defendant's negligence was the proximate cause of his injury. Skipworth v. Lead Indus. Ass'n, 690 A.2d 169, 172 (Pa.

1997).  Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury alleged.  Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978).

Factors that Pennsylvania courts consider in determining whether a defendant's conduct is a substantial factor in bringing about harm to another are: "(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the point of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) lapse of time." Lux v. Gerald E. Ort Trucking, Inc., 887 A.2d 1281, 1287 (Pa. Super. Ct. 2005). As another court has explained:

> A determination of legal causation, essentially regards "whether the negligence, if any, was so remote that as a matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently, occurred." Novak [v. Jeannette Dist. Mem. Hosp., 410 Pa. Super. 603, 600 A.2d 616, 618 (Pa. Super. Ct. 1991) (citation omitted)]. Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of. Merritt v. City of Chester, 344 Pa. Super. 505, 508, 496 A.2d 1220, 1221 (1985).

Reilly v. Tiergarten Inc., 633 A.2d 208, 210 (Pa. Super. Ct. 1993)

The Court interprets Pinson's FTCA negligence claim as asserting that Officer Frei was negligent for providing her with a razor.  (Doc. Nos. 11 at 3, 52-1,

Ex. 1 at 3.)  Specifically, Pinson's administrative tort claim alleged that on May 25, 2016 "staff negligently gave [Pinson] . . . a razor."  (Doc. No. 52-1, Ex. 1 at 3.)  Similarly, Pinson's amended complaint alleges that Officer Frei violated BOP policy when he left a razor with her.  (Doc. No. 11 at 3.)

In determining whether Frei was negligent for providing Pinson with a razor, the Court turns to the undisputed facts.  In the days leading to the May 25, 2016, incident, Pinson was seen by psychology on numerous occasions.  For instance, on May 19, 2016, the SHU lieutenant contacted psychology and indicated that Pinson was potentially suicidal.  (Doc. No. 31 ¶ 134.)  On evaluation, Pinson stated that she was irritable and stressed over the pending PREA investigation as well as irritated for being told by the Warden that she was manipulating staff.  (Id. ¶¶ 135, 136.)  The psychologist provided that Pinson denied any present suicidal thoughts or the need to go on suicide watch and noted Pinson was low risk for suicide and suicide was not warranted.  (Id. ¶¶ 139, 140.)  The psychologist also believed that Pinson was using this manipulation in order to see psychology more than once a week.  (Id. ¶ 142.)  The psychologist also noted that Pinson's focus on the Care Level 3 incentive items suggested that Pinson was not truly suicidal or at risk for self-harm but rather, was using the threat to obtain secondary gain including increased contacts with psychology and a return of Care Level 3 incentive items.  (Id. ¶ 143.)

On May 24, 2016, Pinson told a psychologist that she was "preparing for war" and reported staff as being "rude and dismissive." (Id. ¶ 144.) The psychologist noted that Pinson's thought process was logical, coherent, and goal oriented, and that she denied suicidal/homicidal/self-injurious behavior ideation, intention or plan. (Id. ¶¶ 147, 148.) The psychologist believed that this encounter was another attempt by Pinson to manipulate the conditions of confinement to obtain an increased dosage in a prescription and to obtain additional medication/Ativan and that Pinson's discussion that day regarding the Transgender Law Center suggested that she was not a suicide risk or a risk of self-harm. (Id. ¶¶ 149, 150.) Importantly, it is undisputed that Pinson was neither on suicide watch nor on any type of razor restriction on May 25, 2016, at the time of the incident. (Id. ¶¶ 193, 216.)

What appears to be in dispute is the exact date in which Pinson was given the razor. In her amended complaint, Plaintiff alleges that she "unsecured the razor blade" on May 25, 2016. (Doc. No. 11 at 3.) However, in her oppositional brief, she claims that the razor "used to self-injure" herself on May 25, 2016, "was acquired" on May 24, 2016 "from Officer Frei." (Doc. No. 47-1 at 5.) Further still, in her administrative tort claim that she filed on May 27, 2016, only two days after the May 25, 2016 incident, Pinson had claimed that she was given the razor

by an unidentified staff member on May 25, 2016, the day of the incident. (Doc. No. 52-1, Ex. 1.)

The Court notes that Frei provided a declaration stating that inmates receive razors on Mondays, Wednesdays, and Fridays. (Doc. No. 31 at ¶ 199.) It is undisputed that at the time of the May 25, 2016 incident wherein Pinson was found self-mutilating herself, Frei arrived to work at 1:45 p.m. and did not pass out razors until after 2:00 p.m. (Id. ¶¶ 218, 219.) Accordingly, Frei could not have given Pinson the razor on May 25, 2016, as he arrived to work after Pinson had already started self-mutilating herself at around 12:30 p.m. (Id. ¶ 187.)

Regardless of whether Pinson was given the razor on May 24 or May 25, 2016, the Court finds that Pinson has failed to state a negligence claim against the United States for providing Pinson with a razor. The undisputed facts reveal that whether Pinson was given a razor on May 24 or May 25, 2016, she was not on suicide watch or on any razor restriction. Therefore, there was no reason to preclude Pinson from having a razor to shave and consequently, no breach of the United States' duty. Accordingly, the Court finds that Pinson cannot sustain a negligence claim under the FTCA against the United States and will grant summary judgment in its favor.[8]

_____

[8] Pinson's oppositional brief attempts to allege that in addition to the foregoing, Defendant Frei also violated Program Statement 5324.08, Suicide Prevention Program, because Frei knew that Pinson was mentally ill, possessed an "object of potentially lethal self-harm" and failed to refer

To the extent that Pinson is alleging that Frei was negligent for failing to collect the razor pursuant to prison policy, the Court finds this claim unavailing. The Court observes that this claim was not specifically raised in Pinson's administrative tort claim filed on May 27, 2016. (Doc. No. 52-1, Ex. A.) Rather, Pinson only set forth the claim that a staff member was negligent when that staff member gave Pinson a razor. (Id.) Consequently, the Court finds that Pinson has failed to present the entirety of her claim to the agency in accordance with 28 U.S.C. §§ 2675(a), 2674, and her claim involving negligence for failure to collect the razor blade cannot proceed until it has been exhausted. See Bank v. Roberts, Civ. No. 06-1232, 2007 WL 1574771, at *9 (M.D. Pa. May 31, 2007); see also Thrower v. U.S., Civ. No. 11-1663, 2012 WL 3678702, at *7 (M.D. Pa. Aug. 24, 2012).

However, assuming that Pinson had properly presented and exhausted this claim with the agency, the Court still finds that summary judgment is properly entered in favor of the United States. Pinson cites to Gray v. United States, 486 F. App'x 975 (3d Cir. 2012) for the proposition that the discretionary function exception is inapplicable to an officer's failure to collect a razor because a specific prison policy sets forth the procedure for prison staff to follow in the collection of

---

Pinson to the shift lieutenant or place her on suicide watch. (Doc. No. 47 ad 13.) However, as previously noted, a complaint cannot be amended through a brief. See Pa. ex rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173 (3d Cir. 1988). Accordingly, this claim is not properly before the Court.

razors which was determined not to involve an element of judgment or choice. In

Gray, the plaintiff alleged that the officer was negligent in failing to retrieve a

razor he had given plaintiff's cellmate on a prior date to shave, which plaintiff's

cellmate used on a later date to attack plaintiff. Id. at 976-77.

In the instant case, however, unlike the factual scenario in Gray where the

plaintiff's cellmate harbored a razor for at least a day, if not longer, and the officer

failed to retrieve the razor for at least a day, if not longer, here, Frei's declaration

as well as Pinson's own administrative tort claim evidence that Pinson acquired the

razor on May 25, 2016, the date of the incident.[9] (Doc. No. 52-1, Ex. 1; Doc. No.

31 ¶¶ 218-20.) Pinson was neither on suicide watch nor restricted from receiving a

razor to shave on this date. (Doc. No. 31 ¶¶ 193, 216.) Accordingly, the temporal

aspect of the day(s) the razor was harbored in the Gray case before it was collected

is drastically different and distinguishable from the case at bar, wherein our

---

[9] The Court finds a clear inconsistency in Pinson's declaration submitted as an attachment to her brief in opposition to Defendants' motion for summary judgment in which she declares she received the razor on May 24, 2016, and Pinson's own administrative tort claim, filed two days after the May 25, 2016 incident wherein she alleges she received the razor on May 25, 2016. The Court observes that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 251 (3d Cir. 2007) (citing Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)). In such circumstances, courts should apply the "sham affidavit doctrine." Id. at 253. The doctrine is equally applicable to declarations, which may be submitted under Rule 56. See In re Chocolate Confectionary Antitrust Litig., 73 Fed. R. Serv. 3d 1378, *3 n.6 (M.D. Pa. 2009); see also Jackson v. Onondaga Cty., 549 F. Supp. 2d 204, 220 (N.D. N.Y. 2008) (providing that the court would not consider Plaintiff's new allegations in response to defendants' motion for summary judgment because they were entirely inconsistent with the allegations of the plaintiff's complaint and it would further deprive defendants of the fair notice envisioned by Fed. R. Civ. P. 8).

Plaintiff injured herself the very same day that the razor was issued and before it could be collected. Moreover, it is undisputed that the incident occurred prior to Frei arriving to work on May 25, 2016. (Doc. No. 31 ¶ 218.) Accordingly, the Court finds that because Pinson obtained the razor on May 25, 2016 and the self-mutilation occurred prior to Frei reporting for work, Frei cannot be found negligent in failing to collect the razor. Therefore, summary judgment will be entered in favor of the United States.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff second motion for discovery, seeking a stay of the briefing deadlines on Defendants' motion for summary judgment (Doc. No. 42), will be denied as moot and Defendants' motion for summary judgment (Doc. No. 20) will be granted. An appropriate Order follows.


  s/Sylvia H. Rambo
  SYLVIA H. RAMBO
  United States District Judge

Dated: February 26, 2018