UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEREMY V. PINSON, | |
| Plaintiff, | CIVIL ACTION NO. 1:17-cv-00584 |
| v. | (SAPORITO, J.) |
| UNITED STATES, *et al.*, | |
| Defendants. | |

## MEMORANDUM

Plaintiff Jeremy Pinson proceeds on claims under the Eighth Amendment, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act ("FTCA"), arising from her[1] confinement at USP Allenwood in 2016. Defendants move for summary judgment. (Doc. 107). For the reasons described below, the Court will grant summary judgment on the *Bivens* claims but deny summary judgment on Pinson's FTCA negligence claim. Because defendants do not address Pinson's separate claim for injunctive relief, any intended request for summary judgment on that claim will be denied without prejudice.

---

[1] Pinson is a transgender woman who also uses the first name "Grace" and uses female pronouns. *See* (Docs. 11, 124).

I. BACKGROUND

Pinson filed the operative complaint (Doc. 11), *pro se*, on May 1, 2017. The complaint asserts (1) *Bivens* claims against BOP employees Elizabete Santos and Michael Magyar, for their failure to offer Pinson sex reassignment surgery; (2) a claim for injunctive relief against the BOP "to provide the sex reassignment denied" by those defendants; and (3) an FTCA claim premised on an officer's negligence in failing to collect a razor from Pinson, which she used to mutilate herself. On February 26, 2018, the district court granted summary judgment to defendants on all claims. Pinson appealed, and the Third Circuit Court of Appeals reversed and remanded. *Pinson v. United States*, 826 F. App'x 237 (3d Cir. 2020). Specifically, the Third Circuit held that the district court improperly weighed the evidence by discrediting or failing to consider Pinson's own declaration. *See id.* at 242-43.

On remand, Pinson was appointed counsel pursuant to 28 U.S.C. § 1915(e)(1). *See* (Docs. 74, 78). Defendants again moved for summary judgment, which Pinson opposed through counsel. With the motion still pending, Pinson's appointed counsel was permitted to withdraw due to an apparent breakdown in attorney-client communication. Thus, Pinson

now proceeds *pro se. See* (Doc. 140).

## II. LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that

"the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

### III.  MATERIAL FACTS[2]

#### A. Medical Care at USP Allenwood

Pinson was incarcerated at USP Allenwood from March 10, 2016, until July 18, 2016. Upon Pinson's arrival, psychologist Alysia Handel

---

[2] The Court describes the facts in the light most favorable to Pinson, the non-movant. *Pastore*, 24 F.3d at 512.

performed an intake screening. Handel noted that Pinson had an extensive history of mental illness and had been formally diagnosed with gender dysphoria in June 2015. Despite counseling and other treatment within the Bureau of Prisons, Pinson had a history of engaging in self-harm, including cutting of the wrists and testicles. The report noted two occasions where Pinson engaged in genital mutilation because of distress over having male genitalia. Based on this medical history, Handel determined that Pinson was a "care level 3 mental health inmate," and should be seen at least weekly in a private session. After Pinson's arrival, Handel met with Pinson 18 times over the following ten weeks.

The prison's clinical director, defendant Dr. Elizabete Stahl, formerly known as Elizabete Santos[3], was also consulted for Pinson's care. Pinson had approximately "five to ten" meetings with Stahl, who managed Pinson's hormone treatments and other aspects of care for her gender dysphoria. At their first meeting, Pinson asked Stahl about the possibility of sex reassignment surgery. Stahl "was very abrupt and she

---

[3] The defendant's surname changed from Santos to Stahl while this litigation was pending. Although records of the relevant period identify the defendant as Santos, the Court refers to the defendant using her current name.

was very sympathetic, but she was saying you're not going to get the surgery while you're in the BOP." Stahl told Pinson:

> [L]ook, this is a federal bureaucracy and like any federal bureaucracy there is the way things should be and then there is the way things are. The way things should be is I'm just able to say you're good. You're ready for the surgery. Let's get it done. The reality is I can't do that. And I can't do that, because (1) the Bureau has never done it before and (2) the likelihood that they're going to do it is just a very contentious issue. And I'll submit to you right now they're going to say no.

(Pinson Dep. 31:11-32:8). Pinson filed a prison grievance, which was denied by defendant Michael Magyar, a health care administrator, after consultation with Stahl.[4] Pinson then met with Stahl and Magyar, and Magyar told Pinson that if the BOP was to offer the surgery, "you can pretty much see Fox News and the Republican Party and Congress having a collective shit fit and your name would be on television everyday as these crazy liberal democrats have paid for a vagina with taxpayer

---

[4] Although the full text of the alleged response is reproduced in defendants' brief (Doc. 113 at 18-19), that text is not included in the statement of material facts or in the corresponding evidence submitted with the motion. *See* (Doc. 112, ¶¶ 20-22). Thus, the content of the response is not considered. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.").

expense." (*Id.*, 33:3-18). Although the BOP had "hundreds" of inmates receiving treatment for gender dysphoria between 2014 and 2016, none were offered sex reassignment surgery during this period.

### B. Special Housing Unit and Self-Harm Incident

On May 9, 2016, after Pinson made allegations of sexual abuse against another inmate, she was moved to a Special Housing Unit ("SHU") until the prison could "more extensively assess [her] safety with being in open population." From May 13 through May 15, Pinson was placed on suicide watch after expressing threats of self-harm. On May 18, Pinson told Handel that she was having urges to cut herself and surrendered a razor to Handel "in case the urges returned." Handel indicated that a renewed suicide watch was not warranted, noting that Pinson had a history of using self-harm "when her demands are not met to her satisfaction" or "as a means of altering the conditions of her environment."

Although razors are available in the prison commissary, BOP policy prohibits SHU inmates from keeping razors as personal property. Inmates are permitted to shave, but razors for shaving are to be "controlled by SHU staff." (Doc. 112-4 at 29-31). At USP Allenwood,

officers distributed disposable razors three days a week, on Monday, Wednesday, and Friday, during the "afternoon shift," which could be any time between 2 p.m. and midnight. However, no party presents any evidence of a BOP or facility policy specifying how and when the razors would be collected.

On Wednesday, May 25, 2016, around 12:30 p.m., a lieutenant making rounds in the SHU discovered Pinson cutting her left arm with a razor. What happened next is unclear from the record, but Magyar ultimately responded to an emergency call and found Pinson "unresponsive."[5] Magyar provided emergency rescue breathing until other health care providers arrived. Pinson sustained lacerations to her left arm, left leg, front and back of her head, scrotum, and tongue.

In her complaint, Pinson alleged that Officer M. Frei gave her the razor she used to cut herself. However, Pinson testified that she did not

---

[5] Although defendants agree that Pinson was found unresponsive, they also contend that the lieutenant who found Pinson immediately placed her in hand restraints and escorted her to Health Services (Doc. 112, ¶¶ 32-34). Defendants do not explain this apparent contradiction, and the parties' evidence does not clarify what happened between the time the lieutenant observed Pinson and the time Magyar found her unresponsive. Because Pinson does not allege negligence based on defendants' immediate response to her injuries on May 25, the ambiguity does not affect the outcome of the motion.

have the razor in her cell for more than 72 hours, and Frei did not work on Mondays, the only day when the razor could have been distributed given the SHU's razor schedule. Pinson later testified that she obtained the razor from an SHU officer but does not recall which one. *See* (Pinson Dep. 40:17-43:20). Although the medical staff can instruct SHU officers not to distribute razors to a particular inmate, Pinson was not on a "razor restriction" at that time of her self-mutilation. However, she testified that the officers in the SHU "all knew I was going to cut myself with a razor, because I told them. I mean, I wasn't in a good place the whole time I was in the Allenwood SHU and they knew it. And I had told them a number of times that I was going to kill myself." (*Id.*, 48:18-23).

## IV. DISCUSSION

Pinson proceeds on Eighth Amendment *Bivens* claims against Stahl and Magyar, a claim for injunctive relief against the BOP, and a negligence claim under the FTCA.

### A. *Bivens* Claims

Pinson contends that the defendants violated her Eighth Amendment right to adequate medical care through "a *de facto* policy of

refusing to provide gender-affirming surgeries[6] of any kind to any transgender prisoner in federal custody." *Bivens* recognized an implied right of action for damages against federal officials for constitutional violations. However, the right does not extend to cases presenting a different "context" from those previously recognized by the Supreme Court. "If the case is different in a meaningful way from previous *Bivens* cases decided . . . then the context is new." *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017). Differences that create a new context can include

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 140. If the case presents a new context, the Court must consider whether other "special factors" cast doubt on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and

---

[6] The parties' filings throughout the case refer to "sex reassignment surgery" and "gender-affirming surgery." Any distinction between the terms does not affect the outcome of the motion.

weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 136. Ultimately, "if a court concludes that even a single reason exists to pause before applying *Bivens* in a new context, then special factors counseling hesitation exist and a *Bivens* remedy does not lie." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (quotations omitted).[7]

The Supreme Court has recognized one case in which an Eighth Amendment claim for damages was permitted against a federal prison officer for denial of medical care. In that case, an inmate with asthma was kept in prison against the advice of doctors, denied medical attention for eight hours after a severe asthma attack, given drugs that made his attack more severe, treated with a faulty respirator, and not timely taken to the hospital, which resulted in his death. *See Carlson v. Green*, 446 U.S. 14, 16 n.1 (1980).

---

[7] The Third Circuit's remand in this case preceded *Egbert* and did not consider the issue of whether a *Bivens* remedy was available in this context. *See* 826 F. App'x 237. Therefore, Pinson's argument that the "mandate rule" precludes dismissal of the *Bivens* claims is unavailing. *See Eichorn v. AT&T Corp.,* 484 F.3d 644, 657 (3d Cir. 2007) ("A district court must implement both the letter and spirit of the mandate it receives from [the appellate court], but district courts are free to consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision.") (quotation omitted).

This case presents a different context. Pinson argues that cases following *Egbert* recognized the *Carlson* context as generally encompassing Eighth Amendment claims premised on deliberate indifference to a serious medical need. However, the Third Circuit's opinions in *Kalu v. Spaulding*, 113 F.4th 311 (3d Cir. 2024), and *Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024), foreclose that broad interpretation.[8] Those cases clarify that even a "minor" distinction from *Carlson* represents an impermissible extension of *Bivens* if it shows "any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Kalu*, 113 F.4th at 331 (quoting *Egbert*, 596 U.S. at 496).

As applied to this case, the refusal to provide a specific kind of surgery during Pinson's roughly four-month stay at USP Allenwood, although distressing to Pinson, is not analogous to *Carlson*, which involved the "total absence of competent medical care" in response to an

---

[8] Briefing had completed before *Kalu* and *Fisher* were decided, but the parties filed notices of supplemental authority (Docs. 136, 137) and were permitted supplemental briefing (Docs. 146, 148, 149).

apparent emergency.[9] Given Pinson's claim that she was denied surgery because of a centralized BOP policy, a *Bivens* claim would potentially "impose liability on prison officials on a systemic level," *Fisher*, 115 F.4th at 207 (quoting *Bulger v. Hurwitz*, 62 F.4th 127, 141 (4th Cir. 2023)), and therefore interfere with federal prison operations "in ways *Carlson* did not contemplate." *Kalu*, 113 F.4th at 328 (citation omitted).

Other "special factors" counsel against extending *Bivens* into this context. As in *Kalu* and *Fisher*, Pinson had access to the prison's administrative remedies, which were unavailable to the estate of the deceased plaintiff in *Carlson*. Further, the provision of chronic medical care "is a specialized activity requiring a high degree of training and qualification," which courts are ill-equipped to regulate, particularly in the prison context. *Peguero v. Quay*, No. 1:22-CV-00057, 2023 WL 2410882, at *9 (M.D. Pa. Mar. 8, 2023) (citation omitted); *see also Haar v. Sage*, No. 1:23-CV-00041, 2024 WL 3904983, at *5 (M.D. Pa. Aug. 22, 2024); *Holton*, 2024 WL 1919238, at *9. The parties' disputes as to the

---

[9] *See Gayle v. Mowatt*, No. 1:23-CV-00861, 2025 WL 903832, at *15-16 (M.D. Pa. Mar. 25, 2025); *Holton v. Finley*, No. 4:21-CV-737, 2024 WL 1919238, at *9 (M.D. Pa. Mar. 21, 2024), report and recommendation adopted, 2024 WL 1913172 (M.D. Pa. May 1, 2024).

evolving standards of care for gender dysphoria, and the political considerations Pinson blames for the denial of surgery, suggest "sound reasons to think Congress might doubt the efficacy or necessity" of a judicially created remedy. *Ziglar*, 582 U.S. at 149 (citation omitted).

Because "[a]ny special factor—even one—suffices to foreclose a new *Bivens* cause of action," *Fisher*, 115 F.4th at 207, defendants are entitled to summary judgment. Thus, the Court does not address the parties' arguments regarding whether the individual defendants' treatment of Pinson was consistent with the standard of care, whether Magyar was personally involved in the decision to deny the surgery, or whether the individual defendants would be entitled to qualified immunity.

### B. Injunctive Relief

Defendants' motion and brief do not substantively address Pinson's claim against the BOP for injunctive relief. *See* (Doc. 113 at 9, 34-35 (stating that "[i]njunctive relief may be available" to Pinson, and she "explicitly seeks such relief against the BOP")). Therefore, any intended request for summary judgment on this claim will be denied without prejudice. Defendants will be granted 30 days in which to file a renewed motion addressing this claim. If a timely motion is not filed, any intended

request for summary judgment on this claim will be deemed waived.

## C. Negligence

Pinson contends that an unknown SHU officer was negligent in allowing her to possess a razor and self-mutilate. The FTCA authorizes suits against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Under Pennsylvania law, "[n]egligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Rabadi v. Great Wolf Lodge of the Poconos LLC*, No. 3:15-CV-00101, 2016 WL 4238638, at *3 (M.D. Pa. Aug. 9, 2016) (quoting *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009)). "To prevail in a negligence action, a plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Id.* (quoting *Berrier v.*

*Simplicity Mfg., Inc.*, 563 F.3d 38, 61 (3d Cir. 2009)).

Turning to the first element, duty, it is well-established that the BOP owes a legal duty to protect the prisoners in its custody. *See* 18 U.S.C. § 4042(a)(2),(3) (the BOP shall provide for the "safekeeping" and "protection . . . of all persons charged with or convicted of offenses against the United States"); *Jones v. United States*, 91 F.3d 623, 624-25 (3d Cir. 1996) ("The statute is unambiguous, and to avert summary judgment [on a negligence claim, the prisoner] was not required to provide a further basis for his contention that defendant had a duty of care toward him."). An officer who fails to reclaim a razor from a prisoner, under circumstances suggesting a recognized threat to prisoner safety, may breach this duty.[10] A reasonable factfinder could infer that the unidentified SHU officer breached this duty in Pinson's case, particularly given the BOP's own policy requiring officers to maintain "control" of the

---

[10] *See, e.g.*, *Bistrian v. Levi*, No. 08-CV-3010, 2020 WL 6951048, at *27-28 (E.D. Pa. Aug. 21, 2020); *Gray v. United States*, No. 1:10-CV-1772, 2013 WL 1703402, at *13 (M.D. Pa. Mar. 28, 2013), report and recommendation adopted, 2013 WL 1703409 (M.D. Pa. Apr. 19, 2013); *see also Wakefield v. United States*, No. 4:13-CV-339-WS-GRJ, 2014 WL 7011629, at *6 (N.D. Fla. Oct. 16, 2014), report and recommendation adopted in relevant part, 2014 WL 7011836 (N.D. Fla. Dec. 11, 2014).

razors within the SHU.[11]

Contrary to defendants' argument, the fact that Pinson cannot identify the particular employee at fault does not itself preclude an FTCA claim, which requires "a negligent or wrongful act or omission of *any* employee of the Government." 28 U.S.C. § 1346(b)(1) (emphasis added).[12] Pinson testified that an SHU officer gave her the razor, and defendants have not shown that this testimony can be disregarded as inconsistent with the record.

Ultimately, a reasonable juror could infer that an employee of the

---

[11] As noted above, no party has pointed to a BOP or facility policy specifically prescribing how razors should be collected in the SHU. Frei's affidavit described his own procedure, but no evidence indicates that it was required, or that other officers followed it. In any case, defendants have not argued that an officer's decision not to collect Pinson's razor for more than 36 hours would constitute the exercise of a "discretionary function" for which the Government is entitled to immunity. *See* 28 U.S.C. § 2680(a); *Gray v. United States*, 486 F. App'x 975, 977 (3d Cir. 2012); *Cestonaro v. United States*, 211 F.3d 749, 756 n.5 (3d Cir. 2000) ("The United States has the burden of proving the applicability of the discretionary function exception.") (citation omitted).

[12] *See Anthony v. United States*, 632 F. Supp. 3d 1017, 1028 n.3 (D. Ariz. 2022); *see also Rocha-Jamarillo v. Madrigal*, 727 F. Supp. 3d 1370, 1383 (M.D. Ga. 2024); *Alegria v. United States*, No. CV 11-809-TUC-HCE, 2012 WL 12842258, at *7 (D. Ariz. Nov. 20, 2012); *Gourgeot v. U.S. Postal Serv.*, No. CIV.A. 07-1621, 2008 WL 4724382, at *3 (E.D. La. Oct. 24, 2008).

government gave Pinson a razor on Monday, May 23, and declined to collect it[13], allowing Pinson to keep a razor indefinitely, until she injured herself on Wednesday, May 25. Defendants argue that Pinson has not shown causation because "the mere existence of negligence and the occurrence of injury are insufficient to impose liability . . ." (Doc. 134 at 28-29 (quoting *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. 2005))). But they do not explain how that general statement entitles the United States to summary judgment on these facts. Pinson's testimony that an officer gave her the razor she used to cut herself is evidence that precludes summary judgment, even if it is possible that she obtained the razor through other means. *Cf. Saunders v. United States*, No. 5:14-CV-48, 2015 WL 997907, at *4-5 (N.D. W.Va. Mar. 6, 2015) (recommending summary judgment against plaintiff who claimed officer negligence from the fact that "certain metal weapons passed through the

---

[13] The inference of officer negligence in collecting razors is potentially supported by another, unexplained fact in the medical notes: that at 10:00 a.m. on Wednesday, May 18, Pinson "gave [Handel] her razor," because Pinson "wanted to get rid of the razor in case the urges [of self-harm] returned." Since razors were distributed in the SHU on Monday, Wednesday, and Friday afternoons, it is unclear why Pinson had a razor on Wednesday morning.

metal detectors," but "did not provide[] evidence that sufficiently eliminates any other potential causes").

## V. CONCLUSION

For the reasons described above, the Court will grant summary judgment to Stahl and Magyar on the *Bivens* claims against them, deny summary judgment on Pinson's FTCA negligence claim, and deny without prejudice any intended request for summary judgment on Pinson's claim for injunctive relief. An appropriate order follows.

Dated: August 25, 2025           *s/Joseph F. Saporito, Jr.*
                                 JOSEPH F. SAPORITO, JR.
                                 United States District Judge